1

**BLUMENTHAL, NORDREHAUG & BHOWMIK**
 Norman B. Blumenthal (State Bar #068687)

2
 Kyle R. Nordrehaug (State Bar #205975)
 Aparajit Bhowmik (State Bar #248066)

3
 Piya Mukherjee (State Bar #274217)
2255 Calle Clara

4
La Jolla, CA 92037
Telephone: (858)551-1223

5
Facsimile: (858) 551-1232

6
Attorneys for Plaintiff

7

8

9
**UNITED STATES DISTRICT COURT**

10
**NORTHERN DISTRICT OF CALIFORNIA**

11

12

13
PAYAL PATEL, an individual, on
behalf of herself, on behalf of all

14
persons similarly situated, and as the
representative of the State of

15
California,

16
             Plaintiff,

17
      v.

18
NIKE RETAIL SERVICES, INC., a
Corporation; and DOES 1 through 50,

19
inclusive,

20
             Defendant.

21

22

23

24

25

26

27

28

CASE No. 3:14-CV-04781-RS

Assigned to the Hon. Richard Seeborg

Class Action

**MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT
OF MOTION FOR CLASS
CERTIFICATION**

DATE:        December 10, 2015
TIME:        1:30 P.M.
CTRM:        3

---

## **TABLE OF CONTENTS**

I.     STATEMENT OF THE ISSUES TO BE DECIDED, [Civil L.R. 7-4(a)(3)] . . 1

II.    LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.    The Administrative Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.    The Executive Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   RELEVANT FACTUAL BACKGROUND, [Civil L.R. 7-4(a)(4)] . . . . . . . . 8

     A.    Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.    The Tasks of the AHC Position Are "Clearly Defined", Under
         "Oversight," and Admitted by Defendant to be "Constrained" . . . . . 10

     C.    The "Head Coaches," Not the Assistant Head Coaches, Had Discretion
         and Independent Judgment As to Matters of Significance As to All
         Aspects of Managing the Store . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     D.    The Defendant's Policy that Class Members Perform "Work of the Same
         Nature as That Performed by the Nonexempt Subordinates" 29 C.F.R.
         541.111(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     E.    ZONE CHARTS Evidence Further Lack of Discretion, the Rotating
         Pool, and the Overtime Hours Worked by Assistant Head Coaches . . 15

     F.    Assistant Head Coaches Were Classified as Exempt During Their
         Uniform Training Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.   ARGUMENT, [Civil L.R. 7-4(a) (5)] . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     A.    Rule 23(a) Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         1.    Ascertainability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         2.    Numerosity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         3.    Commonality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

         4.    Typicality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

         5.    Adequacy of Representation . . . . . . . . . . . . . . . . . . . . . . . . 21

     B.    Rule 23(b) Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         1.    Predominance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

             a.    Plaintiff's Evidence as to the Trial Plan of the Discretion
                and Independent Judgment Prongs . . . . . . . . . . . . . . . . . 22

          b.    Trial Plan of the "Management" Prong . . . . . . . . . . . . . 23

          c.    Trial Plan of the "Primarily Engaged In" Prong . . . . . . . 24

     2.    Class Litigation Is Superior and Manageable . . . . . . . . . . . . . . 25

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# **TABLE OF AUTHORITIES**

<u>Cases</u>:                                                                                     <u>Pages:</u>

*Abiola v. Esa Mgmt*., LLC,
    2014 U.S. Dist. LEXIS 72060, 12-13 (N.D. Cal. May 27, 2014) . . . . . . . . . . 2

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Avilez v. Pinkerton Gov't Servs*.,
    286 F.R.D. 450 (C.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ballard v. Equifax Check Servs., Inc*.,
    186 F.R.D. 589, 594 (E.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Boyd v. Bank of Am. Corp*.,
    300 F.R.D. 431 (C.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23

*Bradley v. Networkers Internat*., LLC,
    211 Cal. App. 4th 1129 (Cal. App. 4th Dist. 2012). . . . . . . . . . . . . . . . . . . . 5

*Brinker Rest. Corp. v. Superior Court*,
    53 Cal. 4th 1004 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Campbell v. PricewaterhouseCoopers, LLP*,
    642 F.3d 820, 830 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cortez v. Purolator Air Filtration Products Co*.,
    23 Cal.4th 163(2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*,
    2014 U.S. Dist. LEXIS 106345 (C.D. Cal. July 30, 2014) . . . . . . . 2, 19, 20-23

*Ellis v. Costco Wholesale Corp*.,
    657 F.3d 970 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Feitelberg v. Credit Suisse First Boston, LLC*
    134 Cal.App.4th 997 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Gould v. Maryland Sound Indus. Inc*.,
    31 Cal. App.4th 1137 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Greko v. Diesel U.S.A., Inc*.,
    277 F.R.D. 419 (N.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 20

*Hanlon v. Chrysler Corp*.,
    150 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Heyen v. Safeway Inc*.,
    216 Cal. App. 4th 795 (Cal. App. 2d Dist. 2013) . . . . . . . . . . . . . . . . . 3, 7, 24

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Wells Fargo Home Mortg. Overtime Pay Litigation,*
    571 F.3d 953 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lilly v. Jamba Juice Co.,*
    2014 U.S. Dist. LEXIS 131997 (N.D. Cal. Sept. 18, 2014) . . . . . . . . . . . . . 1

*Lopez v. UPS,*
    2010 U.S. Dist. LEXIS 26072 (N.D. Cal. Mar. 1, 2010) . . . . . . . . . . . . . . 6-7

*Mazza v. Am. Honda Motor Co.,*
    666 F.3d 581 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Nelson v. Avon,*
    2015 U.S. Dist. LEXIS 51104 (N.D. Cal. Apr. 17, 2015) . . . . . . . 2, 19, 21, 23

*O'Connor v. Uber Techs,*
    2015 U.S. Dist. LEXIS 116482 (N.D. Cal. Sept. 1, 2015) . . . . . . . . . . . . . . . 2

*Ramirez v. Yosemite Water Co., Inc.,*
    20 Cal. 4th 785 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

*Rieve v. Coventry Health Care, Inc.,*
    870 F. Supp. 2d 856 (C.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Reynolds v. Bement,*
    36 Cal. 4th 1075 (Cal. 2005).) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Rodriguez v. Hayes,*
    596 F.3d 1046 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Safeway, Inc. v. Superior Court,*
    238 Cal. App. 4th 1138 (Cal. App. 2d Dist. 2015) . . . . . . . . . . . . . . . . . . . 1-3

*Vinole v. Countrywide Home Loans, Inc.,*
    571 F.3d 935 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541 (U.S. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wolin v. Jaguar Land Rover North Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wolph v. Acer Am. Corp.,*
    272 F.R.D. 477 (N.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Xavier v. Philip Morris USA Inc.,*
    787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Statutes, Rules and Regulations</u>:

FRCP 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Cal. Business & Professions Code §17203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Business & Professions Code §17203.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Cal. Lab. Code §§ 201-203, 226. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Secondary Sources</u>

Manual for Complex Litigation (Fourth) § 21.222 (2004)  . . . . . . . . . . . . . . . . . . . 18

# I.    STATEMENT OF THE ISSUES TO BE DECIDED, [Civil L.R. 7-4(a)(3)]

Plaintiff PAYAL PATEL ("Plaintiff") moves for class certification of the California Business & Professions Code § 17203 ("UCL") claim for restitution. A UCL action is an equitable action where a plaintiff may recover money or property obtained from persons represented by the plaintiff through unfair or unlawful business practices. (*Cortez v. Purolator Air Filtration Products Co.* 23 Cal.4th 163 173 (2000)).

The unfair or unlawful business practice for which Plaintiff seeks restitution is Defendant Nike Retails Services, Inc. ("Defendant's") practice of misclassifying "**Assistant Head Coach"** employees as exempt from receiving overtime wage compensation in violation of the California Labor Code. "Generally, the UCL permits employees to obtain restitution for unpaid wages. *Safeway, Inc. v. Superior Court*, 238 Cal. App. 4th 1138 (Cal. App. 2d Dist. 2015), *citing Cortez*, 23 Cal.4th at 178-79.

Restitution is available where as here "a defendant has wrongfully acquired funds or property in which a plaintiff has an ownership  or vested interest.'" *Feitelberg v. Credit Suisse First Boston, LLC* 134 Cal.App.4th 997, 1012 (2005). Proof of damages, reliance or causation are not elements of the UCL claim. *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (Cal. 2009)("restitution may be ordered 'without individualized proof of deception, reliance, and injury if necessary to prevent ... an unfair practice.'").

Class certification here furthers the remedial purposes of the litigation in that "[a] class action, like litigation in general, has a deterrent as well as a compensatory objective." *Lilly v. Jamba Juice Co*., 2014 U.S. Dist. LEXIS 131997 (N.D. Cal. Sept. 18, 2014).  "'California courts have long recognized wage and hours laws 'concern not only the health and welfare of the workers themselves, but also the public health and general welfare.'" *Abiola v. Esa Mgmt., LLC*, 2014 U.S. Dist. LEXIS 72060, 12-13 (N.D. Cal. May 27, 2014). "In other words, the public as a whole has a stake in enforcing the overtime wage law and creating deterrents to violations of that law." *Reynolds v. Bement*, 36 Cal. 4th 1075, 1093 (Cal. 2005).

In light of the "remedial nature of the enactments authorizing the regulation of wages, hours and working conditions for the benefit of employees," California courts narrowly construe "exemptions from statutory mandatory overtime provisions." *Ramirez v. Yosemite Water Co., Inc*., 20 Cal. 4th 785, 794 (1999) (internal citations and quotation marks omitted).

Accordingly, the trier of fact here when viewing Plaintiff's theory of recovery on the merits must construe the exemptions with an eye toward employee protection. At this stage, when "[p]resented with a class certification motion, a trial court must examine the **plaintiff's theory of recovery**, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate." *Safeway,* 238 Cal. App. 4th at 1146.[1]

**Here, Plaintiff's theory of liability as to Defendant's employment classification policies relies only on facts that Defendant admits to be common to the Class as a whole**. The common legal issue of whether all class members should be classified as exempt or non-exempt from receiving overtime wages, meal periods, and accurate wage statements is one whose answer "would not only be 'apt to drive the resolution of the litigation,' but could in fact be outcome determinative." *O'Connor v. Uber Techs*., 2015 U.S. Dist. LEXIS 116482 at *25-26 (N.D. Cal. Sept. 1, 2015).

Where as here a plaintiff agrees to restrict Plaintiff's liability theory regarding classification to common facts, then predominant common questions exist such that certification is appropriate under F.R.C.P. 23(b)(3). *Nelson v. Avon*, 2015 U.S. Dist. LEXIS 51104 (N.D. Cal. Apr. 17, 2015); *Dobrosky v. Arthur J. Gallagher Serv. Co., LLC*, 2014 U.S. Dist. LEXIS 106345 (C.D. Cal. July 30, 2014); *Greko v. Diesel U.S.A.*, 277 F.R.D. 419, 427-28 (N.D. Cal. 2011)(certification granted where "experience of ASMs in the California stores  [*428]  involves similarities with respect to duties relevant to the misclassification question").

---

[1]   Emphasis added unless otherwise noted.

The Exemptions relied upon by Defendant are the "Administrative" and "Executive" exemptions. Common facts defeat the **Administrative Exemption** under Plaintiff's theory of recovery which is that **the uniformly applicable policies and procedures of Defendant prohibit the Class Members from exercising "discretion and independent judgment" as to matters of significance to the Defendant's enterprise**. The Administrative Exemption cannot apply if this requirement is not met.

Plaintiff's theory of recovery will rely on the same uniform policies and procedures to defeat the **Executive Exemption**, which also requires that employers to afford employees under the exemption with "**discretion and independent judgment**" before subjecting them to the plight of unlimited working hours without overtime for hours in excess of eight (8) hours in a day.  Additionally, Plaintiff's theory of liability is that each Class Member was "nothing more than 'a supervisor drawn from a pool of supervisors' who supervised employees assigned to [them] 'from a pool' and was 'assigned a job or series of jobs from day to day or week to week." (MSJ Order, [Doc. No. 36], *quoting* 29 C.F.R. § 541.104(f).  This theory of liability centers on the Class Members' "recurring responsibilities as, respectively, manager-on-duty ("MOD") and consumer experience leader ("CEL")." (*Id*.).  These recurring responsibilities applied not just to Plaintiff, but to the entire class as a whole. As this Court held in denying Defendant's Motion for Summary Judgment, the theory "**leaves open the possibility that CELs, including Patel, were commonly engaged in non-exempt work such as assisting customers and completing sales**." (MSJ Order, fn. 11, [Doc. No. 36]).

Plaintiff also asserts that the Class Members performed supervision work of the same kind performed by the nonexempt employees.  The law is clear that such work is "'nonexempt,' even when that work is performed by the supervisor." *Heyen v. Safeway Inc*., 216 Cal. App. 4th 795, 822 (Cal. App. 2d Dist. 2013), *citing* (§§ 541.108(g), 541.111(b), 541.115(b))(2001).  Plaintiff respectfully submits that *Heyen* and the cited applicable Regulations therein , Defendant compromised the exempt nature of otherwise exempt supervisory work by allowing non-exempt employees in the store to perform the

same supervisory work as the exempt Assistant Head Coaches.

Common evidence can be used to determine the predominant liability questions given that the same evidence that led this Court to deny Defendant's Motion for Summary Judgment applies equally to the other Class Members.[2]  Given the corporate wide employment manuals and centrally generated job descriptions, there are "significant issues that would predominate an inquiry into whether individual [Assistant Head Coaches] were misclassified." *Greko*, 277 F.R.D. at 427-428.

Classwide adjudication of these exemptions is favored by California Courts as the preferred means of resolving these disputes.  California Courts have recognized that without a class action, the fear of retaliation inherent in the employer-employee relationship will prevent these important rights from being addressed. *Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450, 475 (C.D. Cal. 2012), *overruled on other grounds*, No. 13-55154, slip op. (9th Cir. Mar. 9, 2015) ("the superiority of a class action is evident when considering the grim alternatives. ... individual actions are never brought because the putative class members are hourly employees with relatively modest individual claims and limited resources. Moreover, many class members might not bring individual actions out of fear of retaliation.)

The California Legislature has detailed the importance of narrowly construing exemptions to prevent employers from taking advantage of working people, noting that "[n]umerous studies have linked long work hours to increased rates of accident and injury." *Id*. The Legislature also expressed concern about the impact that the employer practice of requiring employees to work long uninterrupted hours was having on the family: "Family life suffers when either or both parents are kept away from home for an extended period of time on a daily basis." *Id*.

---

[2]  Notably, the issue of certification is a procedural question in California. *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004, 1023 (2012). The issue of whether the Class or Defendant will prevail at trial is left for the trier of fact and is not a matter to be addressed at the class certification stage. *Id*.

Commentators note that these concerns are as real today as when the Legislature passed these laws. (*E.g.*, "A Toxic Work World, Anne Marie Slaughter, NY Times, September 20, 2015, Exhibit 16 ("Workers across the socioeconomic spectrum, from hotel housekeepers to surgeons, have stories about toiling 12- to 16-hour days (often without overtime pay) and experiencing anxiety attacks and exhaustion. Public health experts have begun talking about stress as an epidemic.").[3] Notably, California courts recognize that enforcement of the Labor Code to prevent these abuses is best served by class actions. "This state's public policy supports the use of class actions to enforce California's minimum wage and overtime laws for the benefit of workers." *Bradley v. Networkers Internat., LLC*, 211 Cal. App. 4th 1129, 1141 (Cal. App. 4th Dist. 2012).

The Class of at least **96** employees is objectively defined as "all those individuals employed by Defendant Nike Retail Services, Inc. as exempt Assistant Head Coaches during the period November 25, 2009 to March of 2015. Plaintiff also respectfully moves to certify a **sub-class** of the same group of employees seeking restitution, damages, and penalties only for the time period during which they were classified as exempt and in the training phase of their employment. The law provides as follows:

§ 541.116 **Trainees, executive**.
The exemption is applicable to an employee employed in a bona fide executive capacity and does not include employees training to become executives and not actually performing the duties of an executive.

**Here, Defendant admits that the Class Members were classified as exempt during their four (4) week orientation when they were training to become an "executive."** There is every reason to also certify the training subclass to adjudicate the UCL and Labor Code violations that resulted from the unlawful training time misclassification. Class treatment is the superior way to determine liability that Plaintiff alleges. Every other class certification element is amply met as well: numerosity, typicality, commonality and adequacy of representation. Accordingly, Plaintiff respectfully submits that the motion for class certification should be granted.

---

[3]   Please note that all exhibits are attached to the Bhowmik Decl. filed herewith.

## II.    LEGAL STANDARD

Defendant bears the burden of proof with regard to whether the Class members are properly classified as exempt from the provisions of Wage Order 7. *Ramirez*, 20 Cal. 4th at 794-95 (1999) ("**[T]he assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption**."). Further, Wage Order 7's requirements are stated in the conjunctive: if only one of the requirements for the administrative exemption is lacking, the administrative exemption is inapplicable to the employee.

### A.    The Administrative Exemption

This exemption applies to employees who meet **all** of the following criteria:

   (i)    The performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his/her employer's customers... **and**

   (b)    Who customarily and regularly exercises **discretion and independent judgment**; **and**

...  (d)    Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; ... **and**

   (f)    Who is primarily engaged in duties that meet the test of the exemption.

The seemingly broad term "**Discretion and Independent Judgment**" is actually **narrowed significantly** by the following definitions provided by the incorporated former Federal Regulations:

**An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met ... is not exercising discretion and independent judgment** within the meaning of § 541.2.

(29 C.F.R. § 541.207(c)(1)(2001)).

"**Courts must distinguish between the exercise of discretion "and the use of skill in applying techniques, procedures, or specific standards.**" *Lopez v. UPS*, 2010 U.S. Dist. LEXIS 26072 at *14-15 (N.D. Cal. Mar. 1, 2010), *citing* § 541.207(b) and denying employer's motion for summary judgment.

**Importantly, California authority has accepted utilizing the narrow definitions of "discretion and independent judgment" to apply to both the Administrative and Executive exemptions**. *Lopez* at *14-15. As such, the limitations on the definition of "discretion" stated above apply equally to the term "discretion" as used in the Executive Exemption below.

**B.    The Executive Exemption**

This exemption applies to employees who meet **all** of the following criteria:

(a)    Whose duties and responsibilities involve the **management of the enterprise** in which he/she is employed or of a **customarily recognized department or subdivision** thereof; **and**

(b)    Who **customarily and regularly directs the work of two or more other employees** therein; **and**

(c)    Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; **and**

(d)    Who customarily and regularly exercises discretion and independent judgment; **and**

(e)    Who is primarily engaged in duties which meet the test of the exemption.

(Wage Order 7-2001(1)(A)(1)(a-f).

The term "**Management..of a Customarily Recognized Department or Subdivision**" (Wage Order 7-2001(1)(A)(1)(a)) is **narrowed** by the following law provided by the incorporated regulations.

(f)    It cannot be said, however, that a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool and who is assigned a job or series of jobs from day to day or week to week has the status of an executive. Such an employee is not in charge of a recognized unit with a continuing function.

(29 C.F.R. § 541.104(a)(2001)).

**Part 541.111 (2001) also explains that nonexempt work "is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the 'executive.'"** *Heyen*, 2013 Cal. App. LEXIS 409 (Cal. App. 2d Dist. 2013), *quoting* (§ 541.111(b)).

1         **For both exemptions, "[b]ecause the test is conjunctive, Plaintiff need only**

2 **demonstrate that Defendants have not met their burden as to one part of the test**."

3 *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 869 (C.D. Cal. 2012).

4         In *Gould v. Maryland Sound Indus. Inc.*, 31 Cal. App.4th 1137, 1148-49 (1995),

5 the court recognized that the requirement to pay overtime wages both provides for the

6 welfare of workers and a robust job market for the state's work-force.

7         **California courts have long recognized wage and hours laws "concern**
        **not only the health and welfare of the workers themselves, but also the**

8         **public health and general welfare**." (*California Grape etc. League v.*
        *Industrial Welfare Com.* (1969) 268 Cal. App. 2d 692, 703 [74 Cal. Rptr.

9         313].) In *Monzon, supra*, we observed one purpose of requiring payment
        of overtime wages is "'**to spread employment throughout the work force**

10         **by putting financial pressure on the employer** . . . .'" (224 Cal. App. 3d
        at p. 39.) Thus, overtime wages are another example of a public policy

11         fostering society's interest in a stable job market.

12 *Id.* at 1148-49.

13         Overtime wages are a premium wage designed really not to pay employees more

14 for extra hours worked, but to prevent those extra hours from being worked in the first

15 place so that more employees will be hired and all those employees will be able to have

16 a healthy and productive life because of the premium placed on overtime hours worked.

17

18 **III.    RELEVANT FACTUAL BACKGROUND, [Civil L.R. 7-4(a)(4)]**

19     **A.    Defendant**

20         Nike, Inc.'s ("Nike's") principal business activity is the design, development and

21 worldwide marketing and selling of athletic footwear, apparel, equipment, accessories

22 and services. (10K, <u>Exhibit 1</u>).  Nike is the largest seller of athletic footwear and apparel

23 in the world. Nike sells Nike products to retail accounts, through Nike-owned retail

24 stores and internet websites, and through a mix of independent distributors and licensees

25 throughout the world.

26         For its 2015 fiscal year, Nike listed the following **Executives** and **Administrators**

27 and their respective compensation on its annual proxy statement to the SEC:

28

---

| | | |
|---|---|---|
| Mark G. Parker, | | |
| President and Chief Executive Officer: | | **$16,819,730** |
| Donald W. Blair, | | |
| Executive Vice President and Chief Financial Officer: | | **$4,634,562** |
| Jeanne P. Jackson | | |
| President, Product and Merchandising: | | **$4,703,386** |
| Trevor A. Edwards | | |
| President, NIKE Brand | | **$5,232,074** |
| Eric D. Sprunk | | |
| Chief Operating Officer | | **$4,952,181** |

http://www1.salary.com/NIKE-INC-Executive-Salaries.html and 14A, <u>Exhibit 2</u>.

Nike is also scheduled to pay **$1,009,000,000** in endorsement contracts in the year 2016. (10K at pg. 63 of 133, <u>Exhibit 1</u>). In 2015, Nike's Total Consolidated Revenues amounted to $**30.6 billion**. (10K, <u>Exhibit 1</u> at pg. 121 of 133).

Plaintiff Payal Patel worked for Nike as an Assistant Head Coach and earned a salary of $60,335. (Def. MSJ, pg. 23). Plaintiff testified that as a matter of company policy, she regularly worked 10 hours per day without being provided with meal periods or overtime pay (Doc. No. 1, ¶ 35). Instead of spreading more employment through the workforce so that Assistant Head Coaches could work eight (8) hours a day, Defendant paid millions to executives and a total of a billion dollars to already highly compensated athletes. **Defendant has created a brand that extols the virtues of an active lifestyle, but fails to leave enough time in the day for its own employees to be able to enjoy such benefits**.

> On those rare occasions when I was able to find the time to see my family, I was usually so exhausted that it would be impossible for me to actively interact with my loved ones...

> Given the success of Nike around the world and the fabulous profits that the Corporation earns, clearly, Nike could afford to provide enough staff in their stores to allow all store employees to achieve a healthy balance between their work and their lives. ...

> While no amount of money could ever off-set the time I lost with my family and the toll working all those hours took on my health, at the very least, Nike should be forced to correctly compensate me for all of my time.

(Assistant Head Coach, Cornwell Decl., ¶ 5).

> With a third child on the way, my wife needs my support more than ever but, given the extraordinary amount of time I am required to spend working in order to satisfy Nike's expectations, **I do not know where I will find the**

---

**time to adequately nurture my wife and growing family**.  I have been working in retail since I was nineteen (19) years old and I love my job, but **Nike has made it impossible for me to achieve a healthy, reasonable balance between life and work**.  Indeed, on those occasions when I end a shift at 11:00 PM and I then have to be back at work at 6:00 AM the following morning, Nike does not even provide enough time between shifts for me to sleep, much less for me to spend any quality time with my wife and kids.

(Dakin Decl., ¶ 7)(emphasis original); Whye Decl., ¶ 5 ("I never had enough sleep and constantly felt sleep deprived."); Flores Decl., ¶ 13 ("long hours that I worked for Nike negatively impacted my life at home.); .

### B.     The Tasks of the AHC Position Are "Clearly Defined", Under "Oversight," and Admitted by Defendant to be "Constrained"

Nike products are sold to consumers out of Nike retail stores.  (PMK I, 10:4-17, Exhibit 4).  As of April of 2015, there were twenty-two (22) such stores in California.  (*Id*.)  The Organizational Charts demonstrate that Defendant had a standardized hierarchical chain and Division of Responsibilities across all retail stores in California.

Defendant staffs the Nike retail stores with the following employees: Head Coach, Assistant Head Coach, Coach, Lead/Specialist, and Athlete. (PMK II, 18:11-19, Exhibit 3; Org Charts, PMK II Exhibits 26 & 27, Exhibit 17). As shown therein, the Assistant Head Coaches employees are uniformly subordinate to the Head Coach of the retail stores.   Defendant uniformly classified all Assistant Head Coaches in California as exempt from receiving overtime compensation and has a company policy not to pay them overtime wages. (PMK II, 20:8-10 Exh. 3).

Defendant's Interrogatory Responses confirm that for the 97 Assistant Head Coach position, the standardized "Defendant's job description identifies the general job duties that Defendant reasonably expects Assistant Head Coaches to perform..." (Interrogatory Nos. 4 & 7, Exhibit 5). Defendant also admits that the additional documents that would set forth the job duties Defendant expects Assistant Head Coaches to perform would be included in the Defendant's standardized, corporate training materials and performance evaluations.  (*Id*.)

Both of Defendant's Person Most Knowledgeable witnesses (the "PMKs") further note that the Job Descriptions are used by the Defendant on a classwide basis "[t]o **clearly articulate what the job duties and the role would be**." PMK II, 53:1-7, Exhibit 3. Indeed, Defendant admits that on a classwide basis the Job Description documents are used by the hiring managers "[t]o clearly articulate the job areas to the prospective employee." PMK II, 53:1-54:24, Exhibit 3.

The Job Description describes an employee whose "work is focused on presenting and merchandising product to consumers." (JD, Exhibit 6). The Assistant Head Coach is further described to be an employee who supervises staff and sets priorities, but who uniformly has his or her "**[d]ecisions are guided by policies, procedures, and business plan, receives guidance and oversight from manager."** (*Id.*)

The document reinforces the limitation on discretion by reiterating that any "Actions" taken by the Assistant Head Coach "**impacting company image require management oversight and are constrained by policies."** (*Id.*) Further, the work must always be performed "**within budgetary/financial objectives set by manager**." (*Id*).

The Assistant Head Coaches are "constrained by policies" such as the:

- "**Pulse Playbook**" a 59 page step by step guide that details processes for obtaining consumer feedback (Exhibit 7);

- **Zone Directives** that provide stocking policies and procedure, (PMK II 134:3-25, Exhibit 8); and,

- **Window Directives** that provide window signage policy and procedure (PMK II 146:21-148:8, Exh. 3, Window Dir., Exhibit 9).

Defendant also provides templates that are used on a classwide basis by the Assistant Head Coaches, such as the **BNTL Observation Forms** used by Assistant Head Coaches. These documents are also notably used by **non-exempt Coach employees** to do the same work, Exhibit 10 and PMK Depo. I at 135:5-17, Exhibit 4. Similarly, the Coaching for Excellence Forms is used by Assistant Head Coaches and also by **non-exempt Coach employees**. (PMK I, 144:10-145:16, Exh. 4). Defendant also instituted classwide policies for how these templates were to be used. (*Id.*)

As stated above, the standardized Job Description and the referenced constraints are company wide policy documents:

> Q.   Do you know if this job description applied to the position of assistant head coach for all of California?
> A.   Yes.
> Q.   So it did apply to all of California?
> A.   Yes.
> Q.   Other than yourself, are you aware of any other employees of Nike who would utilize this job description for the assistant head coach?
> A.   Head coach would.

PMK II at 89:10-91:7, Exhibit 3.

Defendant's PMK admits that the other common tasks performed by the Class Members are detailed further in other standardized, corporate documents:

> Q.   What other documents would describe or explain what the role of assistant head coach entailed?
>
> A.   Our ... CFE, Coaching for Excellence, would outline some of those expectations as well. Policy and procedure would also outline expectations in general of employees. That might not necessarily be contained here in the job description.

(*Id.*).

The PMK further explains the standardized nature of the classwide policies referenced above:

> We have policies and procedures that are accessible through our intranet site on Zero. That would be the primary location. There could potentially be procedures that are outlined in manuals that we distribute to stores. You know, the playbook would be an example of a manual that we distribute that outlines expectations.

(PMK II, 91:23-92:10, Exhibit 3).

To standardize operations further, Defendant promulgated "**The Playbook**," a 140 page policy and procedure manual "that was produced and was distributed to all stores." (Org Talent Playbook, Exhibit 11).   The Introduction to the Playbook explains Defendant's dogmatic approach to standardization across all stores:

> As we continue to row as an organization, strengthen our consumer commitment and become even more profitable, **it's essential that our business processes and organizational structures are clearly aligned throughout all of Direct to Consumer, regardless of concept, store size or geography**.

(Playbook, pg. NRS002847, Exhibit 11)

---

The Playbook goes on to explain how tasks and roles across the company are all clearly defined:

> ***USING THIS PLAYBOOK***
> The jobs section provides a summary of all the jobs available in the Direct to Consumer (DTC) family. The summaries include job titles, key job accountabilities, band level and work experience needed. Having this information in one place makes it easy to see what jobs are available and what it takes to fill them. Following the summaries - **Nike's core competencies clearly outline what is expected of a Nike employee at any level and any location**. The playbook continues with the competencies that are most important in DTC to the Athlete and then those that are most relevant to the Leadership Team.
>
> Once we know our job and what is expected of us, the next section outlines our Division of Responsibilities (DOR). **The objective of the DOR is to clearly divide responsibilities within the store by providing specific areas of ownership**.

(*Id*. at NRS002850)

The Playbook "**clearly defined job accountabilities**." The jobs are divided into "groups [which] are the same for all store concepts around the world, which promotes **consistency in job accountabilities, and helps facilitate job movement throughout the DTC organization**." (*Id*. at NRS002851). The uniformity of the job and work environment is so exacting that the standardization expands well beyond California and leads to a remarkable consistency that reaches across the entire world:

> **Global Retail**
> **When consumers walk into any Nike store throughout the world they should expect to receive the same premium consumer experience**, which is tailored to each individual. Similarly, **the retail competencies are the same globally to ensure consistency** from job accountability and career development perspectives.

(*Id*.).

> **C.** **"Head Coaches," Not the Assistant Head Coaches, Had Discretion and Independent Judgment As to Matters of Significance As to All Aspects of Managing the Store**

Working within this well-defined corporate structure, every Assistant Head Coach was uniformly subordinate to a "**Head Coach**," was the employee who actually was able to exercise discretion and independent judgment as to matters of significance in the store. (Patel, 20:24-21:14, Exhibit 12; PMK I, Exhibit 4 at 33:16-23). **As a matter of**

**Defendant's corporate policy, the Head Coach is "[r]esponsible for all aspects of managing a store**." (Head Coach Job Description, <u>Exhibit 13</u>).

> Q      So who was the head coach of Ms. Patel's store?
> THE WITNESS: Mara Harrington.
> Q      And what were the all aspects of managing stores she was responsible for as a key accountability?
> THE WITNESS: All aspects would include **business**, **people**, **operations**, **product**.

(PMK I, <u>Exhibit 4</u> at 45:1-21, 47:6-17; *see also* PMK II, <u>Exhibit 3</u> at 18:17-19 (each retail store location has a Head Coach); Wilson Decl., ¶ 7).

**With the Head Coach in charge of all these aspects of the store, there was no exempt level work left to be done by the Assistant Head Coach**.  As the 30b6 explains, the executive responsibilities of the Head Coach include managing  the sales goals, marketplace planning, marketplace strategy, and the store's payroll and expense budget.  (*Id*. at 50:1-53:5, <u>Exh. 3</u>; Patel Depo., 62:13-25, <u>Exhibit 12</u>). Budgeting is handled at the corporate level.  (PMK II, 161:4-11, <u>Exhibit 4</u>).

**D.      Defendant's Policy that Class Members Perform "Work of the Same Nature as That Performed by the Nonexempt Subordinates" 29 C.F.R. 541.111(b)**

The Playbook includes a chart that "further outlines the roles of each member of the Leadership team," which includes the Head Coach, Assistant Head Coach, and Coaches, Leads, and Specialists. (Playbook at NRS002880, <u>Exhibit 11</u>).

**Notably, the Coaches, Leads, and Specialists are all classified as non-exempt employees**. (PMK II, 20:11-18, <u>Exhibit 3</u>). The Class Members, however, are specifically defined to perform **the following tasks which are also all performed by the non-exempt Coach employees: "PAR, CFE, Corrective Action, Hiring, Coaching, Training."**  (Playbook at NRS002880, <u>Exh. 11</u>).    PAR stands for "Performance Activity Record" which means documenting incidents that took place in the store.  (PMK II, 136:4-16, <u>Exhibit 3</u>).  CFE stands for "Coaching for Excellence" which means having "any informal conversation ... meant to redirect performance..." (*Id*. at 138:15-23).  "Corrective Action" is more formal coaching.

1    **Additional duties that are also performed by Nonexempt Subordinates per**

2    **Defendants's standardized company policy are "Key Holder, CEL, MOD, Alarm**

3    **Codes, Bag Checks, and Safe Codes**." (Playbook at NRS002880, <u>Exhibit 11</u>). These

4    tasks of the Class Members, however, are all performed by the non-exempt Coaches and

5    by the Non-exempt Lead employees.   Further, **even the non-exempt Specialist**

6    **performs the MOD, Bag Check, and Safe Code tasks and, on a limited basis,**

7    **performed the Key Holder, CEL, and Alarm Codes tasks**. (*Id.*).

8    The **MOD** Role is a "Rotating Position" that **rotates between the Assistant Head**

9    **Coaches and non-exempt employees in the store**. Employees who rotate into the role

10   are responsible for managing the cash register, handling bag checks, and responding to

11   consumer issues at the front end of the store. (PMK II at 115:10-18, <u>Exhibit 3</u>).

12   The **CEL** Role is similarly a Rotating Position that is defined in great detail by the

13   43 page CEL Training Manual. (CEL, <u>Exhibit 14</u>). **Assistant Head Coaches and non-**

14   **exempt employees who are drawn from a pool to rotate into this role "oversee the**

15   **sales floor** for a designated time to ensure that customer service programs were being

16   delivered by all athletes, that there is appropriate athlete coverage in each department in

17   the store, and to provide feedback and direction to the athletes

18   **E.    ZONE CHARTS Evidence Further Lack of Discretion, the Rotating**
       **Pool, and the Overtime Hours Worked by Assistant Head Coaches**

19

20   Defendant tells all employees exactly where and when to be in the store using the

     **Zone Chart** policy and procedure.

21

22   **Nike FS Daily Sales and Zone Chart          April 4, 2012**

| Hour | CEL |
|------|-----|
| 10a-11a | **Payal** |
| 11a-12p | English |
| 12p-1p | Erickson |
| 1p-2p | Steve |
| 2p-3p | Keith |
| 3p-4p | English |
| 4p-5p | **Payal** |
| 5p-6p | English |
| 6p-7p | Steve |
| 7p-8p | Keith |
| 8p-9p | ALL |

| Coaches & Leads/Specialist | |
|---|---|
| **Name** | **Shift** |
| Erickson | 6-3 p |
| **Payal** | 9-6 p |
| Steve | 1-10 p |
| English | 10-7 p |
| Keith | 1-10 p |

(Zone Chart, <u>Exhibit 15</u>, NRS001096).

The Zone Charts reinforce that Assistant Head Coaches are designated as **mere participants** in the Leadership team alongside a pool of other supervisors, including **non-exempt "Coach"** employees and **non-exempt "Specialist"** employees. (PMK I, <u>Exh. 4</u> at 120:11-123:21).

**The Assistant Head Coaches were drawn from this pool to rotate in and out of a CEL role, an MOD, role, or other store areas**. Notably, the Zone Charts are admitted by Defendant to be "a tool that is expected to be used **every day**." (PMK II, 80:2-17, <u>Exhibit 3</u>).

> The Zone Chart is an Excel-based document that stores would have to populate all the information prior to the day it was scheduled to be used. **The current document is auto populated from a scheduling system** that we now use in stores ... .

(PMK II 81:1-8, <u>Exhibit 3</u>).

The Zone Charts show the daily schedules of the Assistant Head Coaches. Demonstrating the Defendant's policy requiring the Assistant Head Coaches to work overtime hours is manageably accomplished by comparing the nine (9) hour schedule on the Zone Charts with the time stamp of the last Daily Recap e-mail of the day.

**OVERTIME**

- Email April 4, 2012 sent at **7:03 PM** - NRS000569
  Scheduled to work from **9-6 PM** - NRS001096
- Email April 5, 2012 sent at **10:39 PM** - NRS000571
  Scheduled to work from **1- 10 PM** - NRS001097

(Plaintiff's Emails as Compared to Zone Charts, <u>Exhibit 15</u>).[4]

---

[4] Plaintiff's schedule has her working at 9 AM the following day after working until almost 11 pm. *Id.*

**F.** **The Assistant Head Coaches Were Classified as Exempt During Their Uniform Training Program**

The Assistant Head Coach undergoes a four (4) week training program. (PMK II at 66:8-18, <u>Exh. 3</u>). The Head Coach is responsible for training all new Assistant Head Coaches. (PMK II 60:5-14, <u>Exh. 3</u>). The training provides the Assistant Head Coaches with a thorough of the standardized policies and procedures described above.

> They leverage an on-boarding agenda and that agenda references numerous pieces of information, policies and procedures, booklets that are handed out like during the orientation and then like actual procedures that they will go through throughout their on-boarding.

(PMK II, 60:15-24, 61:14-63:5, 64:11-17, <u>Exhibit 3</u>).

Defendant uniformly classifies all the Assistant Head Coaches as exempt both during and after the training programs. (PMK II at 66:8-18, <u>Exhibit 3</u>)("The position of assistant head coach is exempt. There's no difference based on the time frame.").   As trainees, just as when they start working as Assistant Head Coaches, these employees do not have their hours recorded or meal periods recorded.  (PMK II 68:1-17, <u>Exhibit 3</u>).

## III.   ARGUMENT, [Civil L.R. 7-4(a) (5)]

Plaintiff seeks to certify a class under Rule 23(b)(3) defined as: "all those individuals employed by Defendant Nike Retail Services, Inc. as exempt Assistant Head Coaches during the period November 25, 2009 to March of 2015."

Additionally, Plaintiff respectfully moves to certify a **sub-class** of the same group of employees seeking restitution, damages, and penalties only for the time period during which they were classified as exempt and in the training phase of their employment.

The Class Period is cut off at March of 2015 because that is when Defendant discontinued the policy and practice that rotated Class Members in and out of the Pool of MOD / CEL employees.  (PMK II, 141:21-25, <u>Exhibit 3</u>).

## A.    Rule 23(a) Requirements

Under Rule 23(a), the Court may certify a class where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed .R. Civ. P. 23(a). In addition to these explicit requirements of "numerosity, commonality, typicality and adequacy of representation," *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012), an implied prerequisite to class certification is that "the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists." *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011); *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011).

### 1.    Ascertainability

A class is ascertainable if it is defined by objective criteria and "sufficiently definite so that it is administratively feasible" to determine whether a particular individual is a member of the class. *Wolph*, 2012 U.S. Dist. LEXIS 40159, 2012 WL 993531, at *1-2. Ascertainbility, as one court in this district has noted, "is needed for properly enforcing the preclusive effect of final judgment." *Xavier*, 787 F. Supp. 2d at 1089. "The class definition must be clear in its applicability so that it will be clear later on whose rights are merged into the judgment, that is, who gets the benefit of any relief and who gets the burden of any loss." *Id.; see also* Manual for Complex Litigation (Fourth) § 21.222 (2004).

Here, the ascertainability criterion of Plaintiff's proposed class definition has been demonstrated by Defendant to be ascertainable as Defendant provided a class list following the distribution of a class notice that was distributed to all members of the proposed class based on the Defendant's employment records. (Bhowmik Decl., ¶ 2).

### 2.    Numerosity

The requirement of numerosity is satisfied if the class is so large that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). Additionally, there is no particular number cut-off, as the specific facts of each case may be examined. *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 594 (E.D. Cal. 1999). From November 25, 2009 to March of 2015, Defendant employed at least 96 employees in California in the job positions at issue. (Interrogatory No. 4, Exhibit 5)

### 3.    Commonality

The requirement of commonality is met if there are "questions of law and fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (U.S. 2011). As such, commonality "requires the plaintiff to demonstrate the class members have suffered the same injury." (*Id*. at 2551). Plaintiff objects to a single policy that affects all class member: Defendant's policy of classifying all Assistant Head Coaches as exempt both during training and thereafter.

Common legal questions highlighted by Plaintiff are whether Defendant can meet its burden of demonstrating that the Class Members satisfy the "Discretion and Independent Judgment" prongs of the Executive and Administrative exemptions and whether Defendant can meet its burden of demonstrating that the Class Members satisfying the "Department or subdivision" or "Primarily Engaged In" prongs of the executive exemption.

Accordingly, the merits inquiry in this action will turn on whether Defendant is permitted to apply the executive or administrative exemption on a class-wide basis. See *Dobrosky*, 2014 U.S. Dist. LEXIS 106345 at 50 (evidence of Defendant's centralized policies and procedures demonstrates that the adjudication of the discretion prong predominates); *Nelson*, 2015 U.S. Dist. LEXIS 51104 at 20 ("The third question,

whether DSMs customarily and regularly exercise discretion and independent judgment, is susceptible to common proof because of the theory on which Plaintiffs rely."). In response, Defendant will inevitably raise arguments concerning perceived individual differences among the Class Members. Courts have, however, found "that these issues are more properly addressed under Rule 23(b)(3). Although the analysis of these two elements overlap, the requirements under Rule 23(a)(2) are less rigorous." *Dobrosky*, 2014 U.S. Dist. LEXIS 106345 at 24.

For purposes of Rule 23(a)(2), Plaintiff can satisfy commonality by raising a single common contention that Defendant's policy improperly treats all employees alike for exemption purposes. Defendant's challenges to commonality are more properly addressed under Rule 23(b)(3). *Dobrosky*, 2014 U.S. Dist. LEXIS 106345 at 24.

### 4. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). The test "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). Thus, typicality is satisfied if the plaintiff's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998).

Because Plaintiff's "claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability," *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010), Plaintiff submits that typicality is satisfied.

### 5. Adequacy of Representation

The named plaintiffs in a class action must fairly and adequately protect the interests of the class. FRCP 23(a)(4). In assessing adequacy, a court considers: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class

members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. There are no conflicts between Plaintiff and the proposed class.  Patel Decl., ¶¶ 17-21.

Plaintiff is represented by counsel that has extensive experience in wage and hour class action litigation and has been found as adequate class counsel by several District Courts. *Dobrosky*, 2014 U.S. Dist. LEXIS 106345, *27; and, *Nelson*, 2015 U.S. Dist. LEXIS 51104, *26; *Gripenstraw v. Blazin' Wings, Inc*., 2013 U.S. Dist. LEXIS 179214, *17-18 (E.D. Cal. Dec. 19, 2013); *Ohayon v. Hertz Corp*., 2012 U.S. Dist. LEXIS 148991, 8-9 (N.D. Cal. Oct. 16, 2012); *Schulz v. Qualxserv, LLC*, 2012 U.S. Dist. LEXIS 58561 (S.D. Cal. Apr. 26, 2012); *Dirienzo v. Dunbar Armored, Inc*., 2011 U.S. Dist. LEXIS 36650, *12 (S.D. Cal. Apr. 4, 2011); *Keshishzadeh v. Arthur J. Gallagher Serv. Co*., 2010 U.S. Dist. LEXIS 116380, *11 (S.D. Cal. Oct. 29, 2010). Accordingly, Plaintiff respectfully submits that adequacy is satisfied.

## B.    Rule 23(b) Requirements

A class may be certified under Rule 23(b)(3) if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The (b)(3) class, an "adventuresome innovation" added in the 1960's, adds these requirements of "predominance" and "superiority" in order to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

### 1.    Predominance

"In the context of employment exemptions, individual inquiries are necessary because the "crucial touchstone" is the 'employee's actual job duties and responsibilities.'" *Dobrosky*, 2014 U.S. Dist. LEXIS 106345 at *29, *quoting Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 830 (9th Cir. 2011). But, "uniform

corporate policies will often bear heavily on questions of predominance and superiority. Indeed, courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes." *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d 953, 958-59 (9th Cir. 2009)(citation omitted). "Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." *Id*. "It is, however, improper for a court to certify a class based solely on the existence of a uniform exemption policy, or solely on an employer's expectations that an employee will perform certain tasks and follow certain procedures, Marlo, 639 F.3d at 948." *Dobrosky* at *29-30. "Rather, courts should look to 'whether the employer exercised some level of centralized control in the form of **standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs**, and other factors susceptible to common proof.'" *Dobrosky* at *30, *quoting Vinole v. Countrywide Home Loans, Inc*., 571 F.3d 935, 946 (9th Cir. 2009).

The summary judgment order in favor of the certified class in *Boyd* demonstrates how exemption claims for a certified class can be manageably adjudicated. *Boyd v. Bank of Am. Corp*., 2015 U.S. Dist. LEXIS 78041 (C.D. Cal. May 6, 2015).

> **a.    Trial Plan of "Discretion and Independent Judgment"**

§ 541.107 provides that as the Executive Exemption, "[a] person whose work is so completely routinized that he has no discretion does not qualify for exemption."  The term as to both exemptions also "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a) (2001). Further, an employee who is following prescribed procedures or determining which procedure to follow "is not exercising discretion and independent judgment within the meaning of § 541.2."

**Predominant Common Question #1**: Common evidence will prove that the administrative and executive exemptions do not apply because the Class Members did not exercise discretion and independent judgment as to matters of significance because:

• Class Members' "decisions are guided by policies, procedures, and business plan, and receives guidance and oversight from manager;" (Exhibit 6)

• Class Member actions "impacting company image require management oversight and are constrained by policies;" (Id.)

• Class Member work must be performed "within budgetary / financial objectives set by manager;" (Id.) and,

• Matters of significance were already handled by Corporate, Head Coach, or Automated Systems. (PMK II, 161:4-11, Exh. 3; PMK I at 49:11-53:5, Exh. 4).

**This is the most predominant common question because the adjudication of this prong in Plaintiff's favor can dispose of both exemptions at once.** Trial of the prong is manageable for a class. *Nelson*, 2015 U.S. Dist. LEXIS 51104 at 33 (N.D. Cal. Apr. 17, 2015)("common issues predominate with regard to the exercise of discretion question because it turns on whether the nature of the tasks in which DSMs engage require independent judgment or discretion"); *Dobrosky*, 2014 U.S. Dist. LEXIS 106345 at 43. *Nelson* and *Dobrosky* are both decisions where class certification was granted.

The recent decision in *Boyd* is even more notable because there the court adjudicated the exemption for a certified class on a motion for summary judgment, holding that the class members "do not exercise discretion with regards to matters of significance" and, therefore, the class was "entitled to summary judgment as to this exemption on this independent basis." *Boyd* 2015 U.S. Dist. LEXIS 78041 at 62. The trier of fact here can do the same here.

**b.     Trial Plan of the "Management" Prong**

**Predominant Common Question #2**: Common evidence will, if needed, also prove the alternative theories that the Class Members do not qualify for the Executive Exemption because "each one was a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool." (29 C.F.R. § 541.104(a)).

Q.     And how was the CEL role filled?
A.     It was populated by the opening manager on the day in question and it was, the responsibility was divided amongst the leaders that were present in the building for the day.
Q.     Okay. And with respect to the MOD position, manager on duty, what tasks does that role include?
A.     The MOD role is responsible for managing the front end of the store,

specifically the POS cash register area and also they facilitate bag checks for employees as they leave the building for breaks, meals or at the end of their shifts. Also respond to ... consumer issues at the front of the store.

Q.    ...is this similar to the CEL where, in the sense that it's a rotating position?
A.    That's correct.
Q.    And which employees rotate in and out of the MOD position?
A.    The same employees that are able to perform the CEL role can perform the MOD role.

(PMK II 115:2-116:25, 119: 16-120:5, <u>Exhibit 3</u>).

This theory of liability is based on the theory articulated by the Court in denying Defendant's MSJ that Defendant's policies and practice : **leaves open the possibility that CELs, including Patel, were commonly engaged in non-exempt work such as assisting customers and completing sales**," (MSJ Order, fn. 11, [Doc. No. 36]).

### c.    Trial Plan of the "Primarily Engaged In" Prong

**Predominant Common Question #3**: Common evidence will, if needed, also prove the alternative theory that the Class Members do not qualify for the Executive Exemption because the coaching work performed by the Assistant Head Coaches "consist[ed] of work of the same nature as that performed by the nonexempt subordinates of the 'executive.'" *Heyen*, 2013 Cal. App. LEXIS 409. As noted above, the Class Members shared the MOD and CEL responsibilities with the non-exempt Coach and Specialst employees.  In addition to sharing these tasks, when they were not in the MOD/CEL role, the Class Members also shared the responsibilities of PAR, CFE, Corrective Action, Hiring, Coaching, and Training." *Id*.

### 2.    Common Questions Predominate the Derivative Claims

Plaintiff also asserts "derivative" wage statement claims under Labor Code § 226 and waiting time penalties under Labor Code §§ 201-203. *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 442 (C.D. Cal. 2014).  These claims "raise mostly common questions." *Id*. "For example, late pay and waiting time penalties are appropriate if the defendants acted willfully." The existence of standardized policies means that the "willfulness" issue as to §§ 226 & 203 "will likely rise and fall based on common evidence." *Id.; see also Boyd*, 2015 U.S. Dist. LEXIS at 94-95 ("willful" issue adjudicated for whole class).

### 3.    Class Litigation Is Superior and Manageable

A class action must be the superior method for fair and efficient adjudication of this controversy. Under Rule 23(b)(3), the Court considers: (a) class members' interests in controlling separate actions; (b) the extent and nature of any suits involving the same controversy already initiated; (c) whether concentrating litigation in a particular forum is desirable or undesirable; and (d) the likely difficulties in managing a class action.

There has been one other class action filed in California State Court, but the plaintiff's counsel there is working cooperatively with counsel here and thus has no interest in separately controlling the same class. (Aiwazian Decl., ¶ 8).

The forum is desirable as the case is sufficiently progressed and geographically closer to Defendant's principal place of business in Oregon. Finally, there are no particular difficulties identified at this time in managing this class action. Plaintiff's liability theories are based on common evidence shown by Defendant's policies and practices and Plaintiff's trial plan to ascertain damages is based on Defendant's electronic records of the last email of the day as compared to the schedules set forth in the Zone Charts. Altogether, prosecuting this controversy as a class action presents the superior method for fair and efficient adjudication.

## V.    CONCLUSION

Plaintiff has satisfied the burden under Rule 23 and, therefore, respectfully submits that the class certification motion should be granted. The Court retains discretion to review the appropriateness of class certification if future developments so warrant. *Armstrong v. Davis*, 275 F.3d 849, 872 n.28 (9th Cir. 2001)).

Respectfully submitted,

Dated: September 24, 2015          **BLUMENTHAL, NORDREHAUG & BHOWMIK**

By:    _____/s/_____
          Norman B. Blumenthal
          A.J. Bhowmik
          **Attorney for Plaintiff**

Z:\D\Dropbox\Pending Litigation\Nike - Patel\class cert\p-memo-final.wpd