1   SEYFARTH SHAW LLP
    Jon D. Meer (SBN 144389)
2   E-mail:  jmeer@seyfarth.com
    Sheryl L. Skibbe (SBN 199441)
3   E-mail:  sskibbe@seyfarth.com
    Casey J.T. McCoy (SBN 229106)
4   E-mail: cjtmccoy@seyfarth.com
    Maya Harel (SBN 291990)
5   E-mail:  mharel@seyfarth.com
    2029 Century Park East, Suite 3500
6   Los Angeles, California 90067-3021
    Telephone:     (310) 277-7200
7   Facsimile:     (310) 201-5219

8   Attorneys for Defendant
    NIKE RETAIL SERVICES, INC.

9

10

11                  UNITED STATES DISTRICT COURT

12               NORTHERN DISTRICT OF CALIFORNIA

13

14  PAYAL PATEL, an individual, on behalf of        Case No. 3:14-cv-04781-RS
    herself, on behalf of all persons similarly situated,
15  and as the representative of the State of California,   Assigned to the Hon. Richard Seeborg

16                      Plaintiff,                  **DEFENDANT NIKE RETAIL SERVICES,**
                                                    **INC.'S MEMORANDUM OF POINTS AND**
17              v.                                  **AUTHORITIES IN SUPPORT OF ITS**
                                                    **OPPOSITION TO PLAINTIFF'S MOTION**
18  NIKE RETAIL SERVICES, INC., a Corporation;      **FOR CLASS CERTIFICATION**
    and DOES 1 through 50, inclusive,
19
                        Defendant.                  DATE:        January 14, 2016
20                                                  TIME:        1:30 p.m.
                                                    CTRM:        3
21

22                                                  Complaint Filed:      November 25, 2013

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   PLAINTIFF'S MOTION FOR CLASS CERTIFICATION REQUIRES AN
INDIVIDUALIZED INQUIRY AS TO EACH ELEMENT OF THE "EXECUTIVE
EXEMPTION" AND THE "ADMINISTRATIVE EXEMPTION"................................. 1

    A.    Courts Have Routinely Denied Class Certification In "Misclassification" Cases
Based On Individual Factual Differences ................................................ 2

    B.    Plaintiff Testified That The Job Duties Of The AHCs Vary Based On Different
Locations, Different Management Structures, Different Staffing Levels For The
Hourly Workforce, Different Size And Volume Of Stores, And Different Store
Operations ................................................................................................ 4

    C.    Defendant's Corporate Representative Testified That The Job Duties Of AHCs Vary
Based On Each Store, The Assigned Head Coach And District Director, And
Business Needs. ........................................................................................ 6

III.  PLAINTIFF BEARS THE BURDEN TO ESTABLISH ALL OF THE PREREQUISITES
OF RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE ........................ 7

    A.    Plaintiff Cannot Establish All Of The Requirements Of Rule 23(a) Because She
Does Not Meet Her Burden To Establish Commonality ....................... 7

        1.    A "Common Policy of Misclassification" Cannot Satisfy The Commonality
Requirement Of Rule 23(a) .................................................... 8

        2.    The Court's Prior Ruling On Summary Judgment Demonstrates That
Plaintiff Cannot Satisfy The Commonality Requirements Of Rule 23(a) ............... 9

    B.    Plaintiff Cannot Establish All Of The Requirements Of Rule 23(b)(3) Because She
Cannot Show That "Questions Of Law Or Fact Predominate" ........................... 10

        1.    Plaintiff Cannot Meet Her Burden To Establish That Common Issues
Predominate As To Whether AHCs Were "Primarily Engaged" In Exempt
Duties .................................................................................... 10

            a.    The Evidence Is Conflicting As To Whether Any Particular AHC
Was Primarily Engaged In Exempt Duties ................................. 13

            b.    Evidence of AHCs Performing The Same Work As Subordinates
Does Not Affect Whether They Were Primarily Engaged In
Performing Exempt Duties .......................................................... 19

        2.    Plaintiff Cannot Meet Her Burden To Establish That Common Issues
Predominate As To The Failure Of The AHCs To Exercise "Discretion and
Independent Judgment" ........................................................... 19

        3.    Plaintiff Cannot Meet Her Burden To Establish That Common Issues
Predominate To Show That The AHCs Were Not "Managing A Customarily
Recognized Department Or Subdivision" ................................. 22

i

        a.     Individualized Issues Predominate To Determine the Degree That Each AHC Continued To Manage Their Department Even While Acting As The CEL Or MOD. .................................................................. 22

        b.     Individualized Issues Predominate Regarding The Amount Of Time Each AHC Spent As CEL Or MOD Which Varies Based On Peak Hours, Size Of The Management Team, And Number of Floors. ............... 23

    4.     Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate As To Classwide Damages ............................................................ 24

    5.     Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate For A Sub-Class Of AHCs Who Participate In Various Training Programs ............................................................................................ 24

IV.     CONCLUSION ........................................................................................................ 25

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Aburto v. Verizon Cal., Inc.*,
2012 WL 10381 (C.D. Cal. Jan. 3, 2012)..................................................8

*Akaosugi v. Benihana Nat'l Corp.*,
2012 WL 3999855(N.D. Cal., Sept. 7, 2012) ...................................12, 20

*Astiana v. Ben & Jerry's Homemade, Inc.*,
2014 WL 60097 (N.D. Cal. Jan. 7, 2014) ..............................................24

*Brown v. Fed. Express Corp.*,
249 F.R.D. 580 (N.D. Cal. 2008) .........................................................10

*Casida v. Sears Holdings Corp.*,
2012 WL 3260423 (E.D. Cal. Aug. 8, 2012).......................................9, 13

*Chavez v. Lumber Liquidators, Inc.*,
2012 WL 1004850 (N.D. Cal. Mar. 26, 2012) ........................................9

*Chinese Daily News, Inc. v. Wang*,
132 S. Ct. 74 (2011) ...........................................................................8

*Comcast v. Behrand*,
133 S.Ct. at 1432 (2013)...............................................................10, 24

*Cruz v. Dollar Tree Stores, Inc.*,
270 F.R.D. 499 (N.D. Cal. 2010)..........................................................9

*Gales. v. Winco Foods*,
2011 WL 3794887 (N.D. Cal. Aug. 26, 2011) ....................................4, 12

*Greko v. Diesel USA, Inc.*,
277 F.R.D. 419 (N.D Cal. 2011)......................................................12, 13

*In re First Am. Corp. ERISA Litig.*,
258 F.R.D. 610 (C.D. Cal. 2009) ..........................................................7

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
571 F.3d 953 (9th Cir. 2009)........................................................8, 12, 13

*Marlo v. United Parcel Service, Inc.*,
639 F.3d 942 (9th Cir. 2011).........................................................8, 12

*Mekhitarian v. Deloitte & Touche (ICS), LLC*,
2009 WL 6057248 (C.D. Cal. 2009)....................................................20

*Sepulveda v. Wal-Mart Stores Inc.*,
  275 Fed.Appx. 672 (9th Cir. 2008) ....................................................3

*Sepulveda v. Walmart Stores, Inc.*,
  237 F.R.D. 229 (C.D. Cal. 2006) ..........................................3, 4, 10

*Till v. Saks Inc.*,
  2013 WL 5755671 (N.D. Cal. Sept. 30, 2013) ....................................4

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996)................................................................8

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009)................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
  --- U.S. ---, 131 S. Ct. 2541 (2011)...........................................7, 8, 9, 10

*Wilbur v. Silgan Containers Corp.*,
  2008 WL 3863700 (E.D. Cal. Aug, 19, 2008) ..................................10

*Zinser v. Accufix Research Inst. Inc.*,
  253 F.3d 1180 (9th Cir. 2001).............................................................7

**STATE CASES**

*Arenas v. El Torito Restaurants, Inc.*,
  183 Cal. App. 4th 723 (2010) ..............................................................9

*Dailey v. Sears, Roebuck and Co.*,
  214 Cal. App. 4th 974 (2013) ..............................................................4

*Dunbar v. Albertson's, Inc.*,
  141 Cal. App. 4th 1422 (2006) ............................................................4

*Duran v. U.S. Bank National Assn.*,
  59 Cal. 4th 1 (2014) .............................................................................2

*Heyen v. Safeway Inc.*,
  216 Cal. App. 4th 795 (2013) ............................................................19

*Koval v. Pac. Bell Telephone Co.*,
  232 Cal. App. 4th 1050 (2014) ............................................................9

*Mies v. Sephora USA, Inc.*,
  234 Cal. App. 4th 967 (2015), *reh'g denied* (Mar. 18, 2015),
  *review denied* (June 10, 2015)...........................................11, 12, 13

*Taylor v. United Parcel Serv.*,
  190 Cal. App. 4th 1001 (2010) ..........................................................20

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OTHER STATUTES**

8 Cal. Code Regs. Title 11070(1)(A) ...................................................................2, 20

Cal. Bus. & Prof. Code § 17200 ........................................................................2

Cal. Labor Code § 201 ......................................................................................2

Cal. Labor Code § 202 ......................................................................................2

Cal. Labor Code § 203 ......................................................................................2

Cal. Labor Code § 226 ......................................................................................1

Cal. Labor Code § 510 ......................................................................................1

Cal. Labor Code § 515(e) ................................................................................10

Cal. Labor Code § 1194 ....................................................................................1

Cal. Labor Code § 1198 ....................................................................................1

Cal. Labor Code § 2698 ....................................................................................2

**RULES**

Fed. Rule of Civ. Proc. 23 .................................................................................7

Fed. Rule of Civ. Proc. 23(a) ..............................................................7, 8, 10, 12

Fed. Rule of Civ. Proc. 23(a)(2) ................................................................8, 12

Fed. Rule of Civ. Proc. 23(b) ......................................................................7, 10

Fed. Rule of Civ. Proc. 23(b)(3) .............................................................10, 12, 24

Fed. Rule of Civ. Proc. 30(b)(6) ......................................................................6

**REGULATIONS**

29 C.F.R. § 541.102(b) ...................................................................................19

29 C.F.R. § 541.108(a) ...................................................................................19

1    **I.    INTRODUCTION**

2            Plaintiff Payal Patel ("Plaintiff") contends that this case is appropriate for class certification because

3    she alleges that, "as a matter of company policy, practice, and procedure," Defendant Nike Retail Services,

4    Inc. ("Defendant") misclassified Assistant Head Coaches ("AHCs") as exempt, which resulted in various

5    wage and hour violations.  However, Plaintiff has failed to submit any persuasive evidence that common

6    questions of fact and law predominate over individual inquiries, or that trial of a class action is manageable.

7    Indeed, misclassification cases are inherently unsuitable for class treatment because the analysis is not

8    based on their job title or job description.  Instead, an employee's exempt status depends on what a

9    particular employee actually does—the actual work performed and the actual time spent on exempt or

10   nonexempt responsibilities.

11           As this Court already held, "the evidence in the record is inconclusive regarding whether [Plaintiff]

12   spent the bulk of her time and energies on her duties as the head of a department, or whether she was

13   instead principally dedicated to more general activities" and "it is less clear [whether] Patel was 'primarily

14   engaged in'" exempt tasks.  The Court then found that "a fair and comprehensive reading of the record as a

15   whole presents a hazier picture of [Plaintiff's] daily duties as an assistant head coach."  The picture

16   becomes even hazier when the same issues need to be addressed for approximately 100 other current and

17   former AHCs throughout California.  Just as the Court found that a trier of fact will have to consider an in-

18   depth examination of Plaintiff's particular job duties, the same in-depth examination will be required for

19   each and every individual AHC.  Thus, class certification is unwarranted.

20   **II.    PLAINTIFF'S MOTION FOR CLASS CERTIFICATION REQUIRES AN
         INDIVIDUALIZED INQUIRY AS TO EACH ELEMENT OF THE "EXECUTIVE
21           EXEMPTION" AND THE "ADMINISTRATIVE EXEMPTION"**

22           Plaintiff alleges that Defendant has a "practice of misclassifying 'Assistant Head Coach' employees

23   as exempt from receiving overtime wage compensation in violation of the California Labor Code."  (Dkt. 41,

24   Motion, 1:8-10.)  Based on this alleged misclassification, Plaintiff seeks to pursue a class action on behalf of

25   "all those individuals employed by Defendant Nike Retail Services, Inc. [in California] as exempt Assistant

26   Head Coaches during the period November 25, 2009 to March of 2015."  (Dkt. 41, Motion, 5:11-13.)[1]

27   _____

28   [1] On behalf of the proposed class, Plaintiff seeks monetary damages for failure to pay overtime
     compensation for all hours worked (Cal. Labor Code §§ 510, 1194, and 1198, *et seq.*) (Cmplt., ¶¶ 64-81),
     penalties for inaccurate itemized wage statements (Cal. Labor Code § 226) (Cmplt, ¶¶ 82-85), and waiting

Defendant cannot be liable for Plaintiff's claims if the AHCs meet the requirements for the "executive exemption" under California Wage Order No. 7-2001, Cal. Code Regs., Tit. 8, § 11070(1)(A)(1).  To qualify under the "executive exemption," an individual must:  (1) manage the enterprise or a customarily recognized department or subdivision; (2) direct the work of two or more employees; (3) have the authority to hire or fire other employees or make meaningful recommendations as to hiring, firing, advancement or promotion; (4) exercise discretion and independent judgment; (5) be "primarily engaged" in exempt job duties; and (6) earn a salary equal to twice the state minimum wage for full-time employment.  Wage Order 7-2001, Cal. Code Regs. Tit. 8, § 11070(1)(A)(1)(a)-(f).

Similarly, Defendant cannot be liable for Plaintiff's claims if the AHCs meet the requirements for the "administrative exemption" under California Wage Order No. 7-2001, Cal. Code Regs., Tit. 8, § 11070(1)(A)(2).  To qualify under the "administrative exemption," an individual must be someone who: (1) performs the office or non-manual work directly related to management policies or general business operations of his/her employer or his/her employer's customers; (2) customarily and regularly exercises discretion and independent judgment; (3) performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or (4) who executes under only general supervision, special assignments and tasks; and (5) is primarily engaged in duties that meet the test of the exemption.  Wage Order 7-2001, Cal. Code Regs. Tit. 8, § 11070(1)(A)(2)(a), (b), (d), (e), and (f).

### A. Courts Have Routinely Denied Class Certification In "Misclassification" Cases Based On Individual Factual Differences

In the recent decision in *Duran v. U.S. Bank National Assn.*, 59 Cal. 4th 1, 30 (2014), the California Supreme Court stressed that "misclassification class actions can pose difficult manageability challenges" because "a defense in which **liability itself** is predicated on factual questions specific to individual claimants poses a much greater challenge to manageability." *Id.* (emphasis in original).  In a misclassification case, "[t]he employer still must prove, class member by class member, that the particular employee qualified as exempt." *Id.* at 37.  Thus, "California Courts have been reluctant to certify class actions alleging misclassification." *Id.* at 31 (citations omitted).

---

time penalties for failure to provide wages when due (Cal. Labor Code §§ 201, 202, and 203) (Cmplt, ¶¶ 86-93).  Plaintiff also seeks civil penalties under the California Private Attorney General Act ("PAGA") (Cal. Labor Code § 2698 *et seq.*) (Cmplt., ¶¶ 94-98).  In addition, Plaintiff seeks restitution under the California Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200, *et seq.*) (Cmplt, ¶¶ 49-63).

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

In misclassification cases involving assistant managers in retail stores, courts have been particularly reluctant to grant class certification based on the individualized inquires that would result from the numerous factual differences between stores and individual assistant managers.  In *Sepulveda v. Walmart Stores, Inc.*, 237 F.R.D. 229, 249 (C.D. Cal. 2006),[2] the Court denied class certification in a case involving assistant store managers because "AM duties varied based on the characteristics of the store, its workforce, and the surrounding community; the AM's experience; the management structure of the store; and the personal preferences of SMs, CoMs, and DMs."  *Id.*[3]  In *Sepulveda*, the employer had nationwide "policies and procedures" but individualized issues still precluded class certification because the Court found that the retail stores "differ in the size and composition of the hourly workforce and management structure, the size and sales volume of the store, store location, hours of operation, the age and experience of store associates, the age of the store, and shrink levels."  *Id.* at 239.  As the Court explained:

> In a store with more experienced associates, an AM is required to do less training or planning.  Conversely, a store with high turnover will require more time spent on personnel duties.  If a store has fewer AMs, each AM will have a larger assigned area and will need to spend more time on short term tasks or on the sales floor.  An AM who supervises more hourly associates will tend to spend more time on personnel-related tasks such as evaluations, hiring, promoting, and coaching.  AMs in multi-story stores spend more time on safety, maintenance, and theft issues.  In high volume stores, AMs spend more time on merchandising duties and decisions.  In high shrink store, AMs spend more time on shrink control and loss prevention.  AM duties may even change seasonally; during busy periods, AMs focus on short-term planning and touring their areas rather than long-term planning.

*Id.* at 239-40 (citations to the record omitted).  As the Court further explained, the "[i]ndividual DMs and SMs maintained different practices with respect to AMs.  Some SMs delegate more responsibility to AMs while others may follow-up more closely and take a more hands-on approach."  *Id.* at 240 (citations to the record omitted).  The Court also noted that different stores had different rotations of assignments:

> The frequency of AM rotations among different store areas varies by store, leading to differences in AMs' daily duties.  Some stores assign a particular AM to operations; in other stores, there is no AM assigned to operations, leaving all AMs to share the responsibility for supervising the business offices and verifying operational reports.

> Some California stores have special defined AM roles that do not exist in most other stores.  These include a Personnel AM; a Specialty Groups AM; a Closing AM who is responsible for the transition between the day and evening shifts; or Training AMs.

---

[2] *affd in part, revd in part, on other grounds*, *Sepulveda v. Wal-Mart Stores Inc.*, 275 Fed.Appx. 672 (9th Cir. 2008), *opinion vacated on rehg*, *on other grounds*, 464 Fed.Appx. 636 (9th Cir. 2011).
[3] At Walmart, assistant managers were referred to as "AMs;" store managers were referred to as "SMs;" co-managers were referred to as "CoMs;" and district managers were referred to as "DMs." *Id.* at 237-39.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1   *Id.* at 240 (citations to the record omitted).  *See also Till v. Saks Inc.*, 2013 WL 5755671, at *8 (N.D. Cal.

2   Sept. 30, 2013) (denying class certification for assistant store managers at Saks Fifth Avenue despite

3   allegations of uniform policies and practices; "some claim their duties were affected by Defendants' policies

4   and practices, while others state the precise opposite;" " notably, the necessity of the individualized inquiry is

5   demonstrated by the Assistant Managers who report diametrically opposed experiences while working **in the**

6   **same store at the same time**.") (emphasis added); *Gales. v. Winco Foods*, 2011 WL 3794887, at *6-7 (N.D.

7   Cal. Aug. 26, 2011) (denying class certification for assistant store managers at Winco Foods; tasks

8   performed by potential class members "vary based on whether the shift takes place during the day . . . or

9   night . . . and based on 'different community demographics, different management teams, different numbers

10  and types of hourly employees, different customer preferences and buying patterns, and different levels of

11  experience among employees and management'"; "the amount of time AMs spend on personnel

12  management varies significantly based on employee turnover, employee experience, the economy, the Store

13  Manager's style, the AM's experience . . . the amount of time AMs spend on managing employee efficiency

14  varies from AM to AM, store to store, week to week, and shift to shift based on a variety of factors").[4]

### B. Plaintiff Testified That The Job Duties Of The AHCs Vary Based On Different Locations, Different Management Structures, Different Staffing Levels For The Hourly Workforce, Different Size And Volume Of Stores, And Different Store Operations

17          The differences that caused courts to routinely deny class certification for assistant managers in

18  other retail store cases undeniably exist in the present case.  As Plaintiff testified, "Nike had different types

19  of store configurations."  (Patel Dep. 21:18-20.)   The different store configurations include "Niketown

20  stores," "Nike running stores," "Nike women's stores," and "Nike super centers."  (Patel Dep. 21:21-23:4.)

21  Plaintiff further testified that "each of the stores had different physical layouts."  (Patel Dep. 22:5-7.)  Also,

22  "some stores had multiple floors and some stores were only on one floor."  (Patel Dep. 30:8-10.)  Plaintiff

23  further testified that "each of the stores had different hours of operations," "different levels of business

---

[4] *Accord Dailey v. Sears, Roebuck and Co.*, 214 Cal. App. 4th 974, 996 (2013) (affirming denial of class certification of auto center managers and assistant managers; "the proposed class members have flexibility in applying the allegedly 'uniform' policies and practices in their stores [and] the day to day tasks of Managers and Assistant Managers, rather than being uniformly dictated by these few policies and practices, vary greatly depending on a number of factors, ranging from the store's location to particular management styles and preferences"); *Dunbar v. Albertson's, Inc.*, 141 Cal. App. 4th 1422, 1431 (2006) (affirming denial of class certification of grocery store managers; "the significant variation in the grocery managers' work from store to store and week to week" required "very particularized individual liability determinations.").

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

volume," "different levels of foot traffic or customers in the store," and "different departments of zones of operations."  (Patel Dep. 22:15-23:5.)

Plaintiff further testified that staffing at each of the stores was different because the stores had "different numbers of employees staffed," and "different numbers of managerial employees."  (Patel Dep. 22:8-22:14.)  Plaintiff further testified that "the stores had different numbers of leads" and "different numbers of athletes."  (Patel Dep. 23:16-21.)  With respect to employee scheduling, Plaintiff testified that "the stores had different structures in terms of how many employees work on each shift" and "different stores had different numbers of employees staffed in different departments at different times."  (Patel Dep. 23:22-24, 29:10-14.; *see also* Separate Statement "SS" ¶¶ 9-17.)[5]

The managerial duties of the AHCs also differed from store to store.  As Plaintiff testified "some stores had more performance management issues than others."  (Patel Dep. 111:25-112:2.)  This meant that the "number of in the moment coaching's or formal coaching would depend on the performance of particular employees in a particular store."  (Patel Dep. 110:8-11.)  Each store might also be affected by a different "level of turnover."  (Patel Dep. 111:19-24; SS ¶ 89.)

Managerial duties were also different in different departments or zones.  Plaintiff testified that "the zonings were the different departments or different roles at the store."  (Patel Dep. 126:16-18.)  For each AHC, daily activities were based on business needs.  As Plaintiff testified "even though there are schedules listing the different roles that managers have on a shift, the schedules could change daily based on business needs."  (Patel Dep. 130:2-5.)  This meant that "some managers may perform some roles for longer periods than others."  (Patel Dep. 130:6-11.)  Managerial duties were also somewhat a matter of personal preference and "different assistant head coaches had different management styles."  (Patel Dep. 201:1-3.)

The reporting relationships among the AHCs also differed.  Although all AHCs reported to a Head Coach, Plaintiff testified that "some stores had one assistant head coach [and] some stores had two or three or more assistant head coaches."  (Patel Dep. 207:4-7; SS ¶¶ 5-8.)  Based on a variety of factors, "the assistant head coaches may have worked different hours in different stores."  (Patel Dep. 208:4-6.)

The amount of time that AHCs spent hiring or firing employees also differed.  Plaintiff testified that "assistant head coaches in the stores that had more volume in hiring might spend more time making

---

[5] For the Court's convenience, the Separate Summary Statement provides a summary of supporting evidence.

1   recommendations about hiring." (Patel Dep. 209:8-10, 14.)  Also, "different assistant head coaches could

2   spend different amounts of time on making recommendations for termination." (Patel Dep. 210:18-22.)

3   With respect to managing employee performance "if one assistant head coach did 10 Performance Activity

4   Records one day and another assistant [head] coach did 10 Performance Activity Records the same day, the

5   first [assistant] head coach might have spent two hours doing that and the second [assistant] head coach

6   might have spent a half hour doing that." (Patel Dep. 228:6-12.)  With respect to informal employee

7   counselings "different assistant head coaches could spend different amounts of time doing that." (Patel

8   Dep. 229:16-20; SS ¶¶ 41-48, 53-64, 89.)

9          With respect to employee supervision, Plaintiff testified that "different assistant head coaches might

10  have more direct reports than others and so might have to spend more time [supervising] given the number of

11  direct reports they have." (Patel Dep. 213:17-21.)  Also, "even within the same store, the number of direct

12  reports to an Assistant Head Coach could change daily or monthly or quarterly or yearly." (Patel Dep. 214:5-

13  8.)  As Plaintiff explained, even though the "assistant head coaches all had expectations about managing,

14  training, hiring, disciplining, and supervising employees, the amount of time they might spend on each of

15  those duties would vary from store to store or the number of direct reports." (Patel Dep. 214:20-25.)

16      **C. Defendant's Corporate Representative Testified That The Job Duties Of AHCs Vary Based
        On Each Store, The Assigned Head Coach And District Director, And Business Needs.**

17          Clarence Dorsey, Defendant's corporate witness designated under Fed. Rule of Civ. Proc. 30(b)(6),

18  testified that the expectations for the AHCs are different based on a variety of factors.  "The expectations

19  could vary by location because each store is different [and] how the expectations vary on a store by store basis

20  could be influenced by the district store director, the head coach, [and] the needs of the business." (Dorsey

21  Dep. 47:3-11.)  As the corporate witness explained, job duties "would vary on a store-by-store basis [and] you

22  would have to probably check with each store, each head coach, to understand. (Dorsey Dep. 47:12-16.)

23          Even though all of the AHCs in California had the same written job description, there were

24  numerous additional duties.  As the corporate witness explained, "I think this [job description] is a high-

25  level overview of the expectation.  There is a lot of other variables that come into play, store specific,

26  market specific, region specific, that would . . . be in addition to what's here." (Dorsey Dep. 90:16-25.)

27  The corporate witness further explained that the "key accountabilities" and "key capabilities" portions of

28

6

1   the written job description "doesn't provide specifics and it doesn't account for any key differences that you

2   might find, . . . based on store, based on market, based on size of team, those are nuances that could impact

3   what the expectation of the role[s] are."  (Dorsey Dep. 93:18-94:5.)

4          The corporate witness also explained the "expectations of the work performed by an assistant head

5   coach could be different if the assistant head coach was the coach of operations versus the assistant head

6   coach of product.  (Dorsey Dep. 156:17-23.)  As the corporate witness explained, "you have different

7   expectations if an assistant head coach is in an inline store compared to a factory store" and "the expectations

8   differ if the assistant head coach is in a small store compared to a large volume store."  (Dorsey Dep. 156:24-

9   157:2.)  Also, the "expectations of what the assistant head coach is doing change if there is more than one

10  assistant head coach in the store."  (Dorsey Dep. 157:7-10.)  The expectations would also be different based

11  on "the number of direct reports [and] the size of the team."  (Dorsey Dep. 167:5-18.)

12  ### III.   PLAINTIFF BEARS THE BURDEN TO ESTABLISH ALL OF THE PREREQUISITES OF RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

13         While Defendant may bear the burden of proof to support the assertion that AHCs are properly

14  classified as exempt, Plaintiff bears the burden on class certification.  *Wal-Mart Stores, Inc. v. Dukes*

15  *("Dukes"),*  --- U.S. ---, 131 S. Ct. 2541, 2251 (2011) ("A party seeking class certification must

16  affirmatively demonstrate his compliance with the Rule."); *Zinser v. Accufix Research Inst. Inc.*, 253 F.3d

17  1180, 1186 (9th Cir. 2001) (finding that plaintiff bears the burden of demonstrating that class certification is

18  proper).  A plaintiff seeking to maintain a class action "must offer facts sufficient to satisfy the requirements

19  of Rule 23(a) and (b)."  *In re First Am. Corp. ERISA Litig.*, 258 F.R.D. 610, 616 (C.D. Cal. 2009) (citing

20  *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308-09 (9th Cir. 1977)).  Before certifying a class, "a trial

21  court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the

22  prerequisites of Rule 23 of the Federal Rules of Civil Procedure."  *Comcast v. Behrand*, --- U.S. ---, 133 S.

23  Ct. 1426, 1432 (2013).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the

24  plaintiff's underlying claim."  *Dukes*, 131 S. Ct. at 2550-51.

25  ### A.   Plaintiff Cannot Establish All Of The Requirements Of Rule 23(a) Because She Does Not Meet Her Burden To Establish Commonality

26         To meet her burden, Plaintiff must satisfy the evidentiary obligations of Rule 23(a) by showing that:

27

28  (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or

7

1  fact common to the class, (3) the claims or defenses of the representatives are typical of the claims or

2  defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of all

3  members of the class.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996).

4      To meet her burden to show commonality, Plaintiff must demonstrate that the potential class

5  members "have suffered the same injury." *Dukes*, 131 S. Ct. at 2551.  "This does not mean merely that

6  they have all suffered a violation of the same provision of law." *Id.*[6]  Indeed, "the mere claim by employees

7  of the same company that they have suffered [an] injury . . . gives no cause to believe that all their claims

8  can productively be litigated at once." *Id.*  To satisfy the "commonality" requirements of Rule 23(a)(2),

9  there must be **common questions** that are subject to **common answers**. *Id.* (emphasis added).  "What

10  matters to class certification is not the raising of common questions – even in droves – but rather the

11  capacity of a classwide proceeding to generate common answers apt to drive the resolution of the

12  litigation." *Id.*  As the Supreme Court stressed, there must be a common contention of "such a nature that it

13  is capable of classwide resolution – which means that determination of its truth or falsity will resolve an

14  issue that is central to the validity of each one of the claims **in one stroke**." *Id.* (emphasis added).

**1.  A "Common Policy of Misclassification" Cannot Satisfy The Commonality Requirement Of Rule 23(a)**

16      Here, Plaintiff merely alleges that all of the AHCs have a common job title and were subject to a

17  "single policy" of "classifying all Assistant Head Coaches as exempt."  (Dkt. 41, Motion, 19:15-17; 20:8-

18  10.)  Plaintiff argues that common issues exist because "Defendant's policy **improperly treats all**

19  **employees alike** for exemption purposes."  (Dkt. 41, Motion, 20:8-10; emphasis added).

20      However, a "common policy of misclassification" cannot support the commonality requirement of

21  Rule 23(a) because a "common" policy or practice of treating employees as exempt "does not necessarily

22  establish that [employees] were misclassified, because **the policy may have accurately classified some**

23  **employees and misclassified others**." *Marlo v. United Parcel Service, Inc.*, 639 F.3d 942, 948 (9th Cir.

24  2011) (emphasis added).  *See also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959

26  [6] Numerous courts have applied *Dukes* to wage and hour class actions, including claims under the California Labor Code.  *See, e.g.*, *Chinese Daily News, Inc. v. Wang*, 132 S. Ct. 74 (2011) (vacating judgment in alleged misclassification case pursuant to *Dukes*); *Aburto v. Verizon Cal., Inc.*, 2012 WL 10381, *5-6 (C.D. Cal. Jan. 3, 2012) (applying *Dukes* to deny class certification in case involving the executive exemption and holding that, pursuant to *Dukes*, the class proponent must show that "the class members 'have suffered the same injury'" and that their claims can be resolved in "one stroke.").

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

(9th Cir. 2009) (reversing a grant of class certification based on the blanket classification of a job position as exempt; a uniform policy of misclassification "does nothing to facilitate common proof on the otherwise individualized issues").  Thus, "a district court abuses its discretion in relying on an internal uniform exemption policy" to determine whether there are common issues.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009).[7]

### 2. The Court's Prior Ruling On Summary Judgment Demonstrates That Plaintiff Cannot Satisfy The Commonality Requirements Of Rule 23(a)

Plaintiff argues that the Court's prior decision denying Defendant's Motion for Summary Judgment "leaves open the possibility that [AHCs], including Patel, were commonly engaged in non-exempt work such as assisting customers and completing sales."  (Dkt. 41, Motion, 3:18-21.)  Plaintiff then concludes that "common evidence can be used to determine the predominant liability questions, given that the same evidence that led this Court to deny Defendant's Motion for Summary Judgment applies equally to the other Class Members."  (Dkt. 41, Motion, 4:2-4.)

However, the triable issues identified by the Court are precisely the types of issues that **cannot** be determined "in one stroke," as required by the Supreme Court in *Dukes*, 131 S. Ct. at 2551.  As this Court already found "at bottom, the evidence in the record is **inconclusive** regarding whether Patel spent the bulk of her time and energies on her duties as the head of a department, or whether she was instead principally dedicated to more general activities."  (Dkt. 36, MSJ Order, 9:19-10:3; emphasis added.)  The Court further found that the evidence showed that Plaintiff performed exempt managerial functions, but there were triable issues as to whether she was primarily engaged in exempt work -- "There is no colorable dispute that

---

[7] *See also Casida v. Sears Holdings Corp.*, 2012 WL 3260423 at *17 (E.D. Cal. Aug. 8, 2012) (finding that "despite the corporate standardization and the uniformity of tasks to be performed by the ASMs, evidence would be needed to prove misclassification of the class as to each prospective class member;" "a blanket exemption policy 'does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties'"); *Chavez v. Lumber Liquidators, Inc.*, 2012 WL 1004850, *5 (N.D. Cal. Mar. 26, 2012) ("The only class-wide policy identified by Plaintiffs—the classification of Store Managers as exempt—is insufficient to raise a common question."); *Cruz v. Dollar Tree Stores, Inc.*, 270 F.R.D. 499, 504 (N.D. Cal. 2010) (rejecting any rule that "creates a presumption that class certification is proper when an employer's internal exemption policies are applied uniformly to the employees").  *Accord Koval v. Pac. Bell Telephone Co.*, 232 Cal. App. 4th 1050, 1060 (2014) ("Existence of a uniform policy does not limit a trial court's inquiry into whether the class action treatment is appropriate."); *Arenas v. El Torito Restaurants, Inc.*, 183 Cal. App. 4th 723, 734 (2010) ("The trial court concluded Plaintiff's theory of recovery—that managers, based solely on their job descriptions, were as a rule misclassified—was not amendable to common proof" given evidence employees' "duties and time spent on individual tasks varied widely.").

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1   Patel's work on these managerial functions was exempt.  It is less clear, however, whether Patel was

2   'primarily engaged in' such tasks."  (Dkt. 36, MSJ Order, 11:12-13.)

3            As the Court held, it would be necessary for the trier of fact to decide what percentage of time

4   Plaintiff spent on exempt or nonexempt duties, given that "Patel's work on the floor **encompassed both**

5   **exempt and nonexempt tasks**."  (Dkt. 36, MSJ Order, 12:5; emphasis added.)  The Court further held that

6   "Patel's isolated testimony" about her time spent "managing the operations of the store" is "simply not

7   dispositive evidence of the primacy of exempt duties during her work day" and "a fair and comprehensive

8   reading of the record as a whole presents a hazier picture of Patel's daily duties as an assistant head coach."

9   (Dkt. 36, MSJ Order, 13:1-4.)  Given that the Court has already determined that it will be necessary for the

10  trier of fact to examine Plaintiff's "daily duties as an assistant head coach," it will similarly be necessary for

11  the trier of fact to examine the daily duties of each and every AHC to determine which AHCs were

12  primarily engaged in exempt work, in order to determine which AHCs were properly classified.

    **B.  Plaintiff Cannot Establish All Of The Requirements Of Rule 23(b)(3) Because She Cannot Show That "Questions Of Law Or Fact Predominate"**

14           Even if Plaintiff could meet her burden to satisfy the requisite commonality and all other requirements

15  of Rule 23(a), she still cannot meet her burden to show that "questions of law or fact common to class

16  members **predominate** over questions affecting only individual members," as required under Rule 23(b)(3).[8]

17  "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," and compels a close

18  assessment of whether "questions of law or fact common to class members **predominate** over any questions

19  affecting only individual members."  *Comcast*, 133 S.Ct. at 1432 (emphasis added).  Thus, Rule 23(b)

20  necessarily requires the Court to "first examine the substantive issues raised by Plaintiffs and second inquire

21  into the proof relevant to each issue."  *Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 584 (N.D. Cal. 2008).

    **1.  Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate As To Whether AHCs Were "Primarily Engaged" In Exempt Duties**

24           In order to meet the requirement to be "primarily engaged" in exempt duties, "more than one-half of

25  the employee's worktime" must be spent on exempt tasks.  Cal. Labor Code § 515(e).[9]  As this Court has

---

[8] In addition to the requirement to satisfy all of the elements of Rule 23(a), Plaintiff must also satisfy at least one requirement of Rule 23(b).  *Dukes*, 131 S. Ct. at 2548; *Sepulveda*, 237 F.R.D. at 244.  Plaintiff does not move under 23(b)(1) or 23(b)(2).  Thus, only 23(b)(3) is at issue.

[9] Exempt duties also include duties that are "directly and closely related" to managerial responsibilities, even if such duties also are performed by hourly employees.  *See, e.g.*, *Wilbur v. Silgan Containers Corp.*, 2008

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1   already held, "[t]he work actually performed by the employee during the course of the workweek must, first

2   and foremost, be examined and **the amount of time the employee spends on such work**, together with the

3   employer's realistic expectations and the realistic requirements of the job, shall be considered in

4   determining whether the employee satisfies the requirement.  (Dkt. 36, MSJ Order, 10:8-14, citing Cal.

5   Code Regs. Tit. 8 § 11070 subdiv. (1)(A)(1)(e); emphasis added.)  As this Court has also already held, the

6   duties performed by Plaintiff in this case "encompassed both exempt and non-exempt tasks."  (Dkt. 36,

7   MSJ Order, 12:5.)  Thus, an individualized inquiry would be necessary to determine whether Plaintiff or

8   any other AHC was primarily engaged in exempt duties.

9       The recent decision in *Mies v. Sephora USA, Inc.*, 234 Cal. App. 4th 967 (2015), *reh'g denied* (Mar.

10   18, 2015), *review denied* (June 10, 2015), is instructive.  There, the plaintiff sought class certification based on

11   misclassification of 99 employees who worked as "Specialists" at a chain of retail cosmetics stores in

12   California.  *Id.* at 971.  Each store had a Store Director who managed the store and one to four Specialists who

13   managed sales associates.  *Id.*  These Specialists had "a single job description" that included activities such as

14   "directly manage a zone in terms of sales, operational and human resources functions," "ensure . . . adherence

15   to corporate culture and policies, model client service standards, recruitment, supervision, and discipline of

16   employees, ensure store presentations are appropriate [and] conduct inventories."  *Id.*  The job description

17   included both non-exempt job responsibilities, such as "learn to perform cashier duties," and exempt

18   responsibilities, such as "assume Store Director's responsibilities when assigned as Director-In- Charge."  *Id.*

19       In denying class certification, the trial court concluded that the "central issue for trial" would be

20   "**how the Specialists spend their time**, not whether a given task is exempt."  *Id.* at 975 (emphasis in

21   original).  Based on declarations submitted by the parties, the trial court concluded that "some Specialists

22   spend more, and some Specialists spend less, than 50 percent of their time doing exempt work, and it was

23   not clear how it could determine on a class-wide basis how the Specialists spent their time and whether they

24   were collectively nonexempt or exempt."  *Id.*

25

26   WL 3863700, at *10, *12 (E.D. Cal. Aug, 19, 2008) ("Even if Plaintiff performed some non-exempt tasks,
     he was still primarily engaged in exempt work;" under California law, supervisory or exempt duties also

27   include non-exempt work that is "directly and closely related to exempt duties;" such "directly and closely
     related" non-exempt work very often overlaps with exempt supervisory work, so that a supervisor can better

28   manage employees who exclusively perform warehouse jobs; exempt duties "include all work 'directly and
     closely related to exempt work and work … properly viewed as a means for carrying out exempt functions'").

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1    The California Court of Appeal affirmed the denial of class certification on the grounds that the

2  "Specialists' exempt duties vary significantly from store to store and Specialist to Specialist, despite there

3  being an understanding as to what tasks Specialists are likely to perform and despite Sephora having

4  company-wide operational policies." *Id.* at 982.  As the Court explained, the evidence to be presented at

5  trial would be "less about how to classify certain tasks (such as selling) and the impact of company policies,

6  and more about how individual Specialists spend their time." *Id.*  The Court concluded that denial of class

7  certification was appropriate because the "[w]ide variation among class members is a factor informing

8  whether the exemption question can be resolved by a simple 'yes' or 'no' answer for the entire class." *Id.* at

9  982-83 (citing *Duran*, 59 Cal. 4th at 32).

10    Although the Court acknowledged that there would "likely be common questions about whether a

11  given task involved sufficient discretion or independent judgment to be exempt," it held that resolution of

12  "how Specialists spend their time" would "likely turn less on Sephora's general operational policies, and

13  more on evidence . . . pertaining to the nature of each individual's actual work." *Id.* at 983.  As the Court

14  stressed, "Specialists handled their time very differently, varying as to the nature and level of the tasks and

15  the time spent on those tasks." *Id.  Accord Akaosugi v. Benihana Nat'l Corp.,* 2012 WL 3999855 at *9

16  (N.D. Cal., Sept. 7, 2012) (denying class certification; "the court rejected as insufficient Plaintiffs'

17  declarations that they spent more than 60 % of their time on nonexempt tasks because they failed to detail

18  'with specificity' how much time was spent performing managerial tasks directed at customers or how

19  much time was spent performing nonexempt work, or how the managers calculated the percentages of their

20  time spent on each."); *Gales*, 2011 WL 3794887 at *6 (denying class certification; "The central question in

21  the case [is] whether [the potential class members] spend the majority of their time performing exempt

22  duties.").[10]

23

---

24  [10] The earlier decision in *Greko v. Diesel USA, Inc.*, 277 F.R.D. 419 (N.D Cal. 2011) is of no help to Plaintiff
   (Dkt. 41, Motion, 2, 4, 20).  In *Greko*, the Court held that the Plaintiff met his burden to show commonality
25  under Fed. Rule Civ. Proc. 23(a)(2) because "Greko alleges that all ASMs at Diesel were misclassified as
   exempt" and "this issue is sufficient to demonstrate the threshold level of commonality." *Id.* at 426.  This
26  conclusion has since been flatly rejected by the Ninth Circuit.  *See, e.g., Marlo* 639 F.3d at 948 (finding that
   a "common policy of misclassification" cannot support Rule 23(a)'s commonality requirement because it
27  "does not necessarily establish that [employees] were misclassified, because the policy may have accurately
   classified some employees and misclassified others"); *In re Wells Fargo*, 571 F.3d at 959 (a uniform policy
28  of misclassification "does nothing to facilitate common proof on the otherwise individualized issues").
       In *Greko*, the Court also held that Plaintiff met his burden to show that common questions

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

### a. The Evidence Is Conflicting As To Whether Any Particular AHC Was Primarily Engaged In Exempt Duties

As Plaintiff testified, "some managers may perform roles for longer periods of time than others." (Patel Dep. 130:6-8.)  Although Plaintiff testified that she was "responsible for making sure that employees complied with Nike rules and policies from the time [she] entered the store [to] the time that [she] left the store" (Patel Dep. 50:7-11) and she was "always responsible for managing one or more areas or departments of the store" (Patel Dep. 57:8-10), it is uncertain what percentage of time she was performing exempt duties.  As Plaintiff testified, she spent "80 percent of the job" performing management functions, her duties included both exempt and nonexempt tasks:

> Q.   But 80 percent of the day was then spent out in your department, managing the operations of the department and the employees who work there.
>
> A.   The 80 percent of the job was managing the day-to-day operations of the store, whatever that called for, whether it was assisting customers, putting product out to the floor, cleaning, folding, hanging -- assisting customers, putting out product, cleaning, ringing up customers, greeting customers, folding.  80 percent of the job was just being out on the floor and whatever that entailed.

(Patel Dep. 70:15-25.)  If Plaintiff's own description of her job duties is typical of other AHCs, it would be necessary for each AHC to testify in detail at trial about the percentage of time spent on each exempt or non-exempt task.  Based on Plaintiff's testimony, the Court previously concluded that a trier of fact could predominate under Fed. Rule Civ. Proc. 23(b)(3) because "Greko alleges that operation of the California stores was centrally controlled by corporate headquarters" and "job descriptions are centrally generated." *Greko,* 277 F.R.D. at 427.  This conclusion was rejected in *Casida,* 2012 WL 3260423 at *19, where the court held that a central policy or job classification can provide classwide proof only if "the policy itself is the point in controversy," but not where "the policies are not unlawful in themselves." *Id.*  Although centralized policies or job descriptions can provide background information, "individualized proof would still be important" because "common background facts are not enough to supply a common method of proof." *Id.*  In the present case, the evidence in the record shows that the written job description provides nothing more than background information but does not "provide specifics and it doesn't account for any key differences that you might find based on market, size of team, those are nuances that could impact what the expectation of the role[s] are."  (Dorsey Dep. 93:18:94:5.)

In *Greko,* the Court held that common issues predominate because the relevant question is "whether the activity, regardless of the label the particular employee places on it, constitutes exempt or nonexempt work under California law" and "a second common question involves how the time should be apportioned under California's quantitative approach." *Greko,* 277 F.R.D. at 427  Once again, this conclusion has been flatly rejected -- in *Mies,* 234 Cal. App. 4th at 967, the Court held that class certification was improper "given the evidence as to the varying ways Specialists actually spend their time" and that the evidence to be presented at trial would be "less about how to classify certain tasks (such as selling) and the impact of company policies, and more about how individual Specialists spend their time." *Id.* at 984-85.  *Accord In re Wells Fargo,* 571 F.3d at 959 (holding that due to the need to conduct a "fact-intensive inquiry into each potential plaintiff's employment situation" these circumstances "militate against certification" because "courts must . . . ask" how each "individual employees actually spent their time.").

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1    easily find the she **was** primarily engaged in exempt, managerial work, or might also find that she **was not**

2    primarily engaged in exempt, managerial work.  (Dkt. 36, MSJ Order, 11:12-13, 12:5-15.)  The same

3    individualized inquiry would be necessary for each and every member of the proposed class.  (SS ¶¶ 1-4, 65

4    84-97.)

5            For example, Plaintiff's declarant Paul Ramos testified "as an AHC, approximately seventy (70)

6    percent of my time was spent performing exactly the same duties that nonexempt employees were expected

7    to perform" and such duties included "manual labor involved in setting up and breaking down displays and

8    constructing new fixtures and reconfiguring out dated fixtures" and "replacing dated merchandise with new

9    merchandise" and "folding, hanging, cleaning up, cashiering, shelving, racking, unboxing, re-boxing,

10   shuttling merchandise to and from the stockroom, greeting customers, and waiting on customers."  (Ramos

11   Decl. ¶ 10).[11]  In contrast, Defendant's declarant Ryan Foss testified that "a majority of the time that I spent

12   on the sales floor involved managerial duties"  (Foss Decl. ¶ 24) and "I cannot think of any day or week

13   when I spent more than 25% of my time" working "side by side with my Athletes doing things like making a

14   footwear move [] or providing excellent customer service."  (Foss Decl. ¶ 23).  Both Ramos and Foss were

15   AHCs in charge of the Footwear Department at Nike Factory stores.  (Ramos Dep. 60:22-25; Foss Decl. ¶ 4.)

16           Plaintiff's declarant Tina Flores worked as an AHC in Barstow, California.  (Flores Decl. ¶ 2.)  She

17   testified, "I spent approximately ninety (90) percent of my time performing nonexempt tasks" which

18   included "cashiering, folding, hanging, cleaning up, shelving, racking, unboxing, re-boxing, greeting

19   customers, and waiting on customers."  (Flores Decl. ¶ 11.)[12]  In contrast, Defendant's declarant Cynthia

20   Krieger worked as an AHC at the San Francisco NikeTown.  (Krieger Decl. ¶ 4.)  She testified that as an

21   AHC, she did not spent "more than 10 to 15 % of [her] time in any given week performing nonmanagerial

22   work," which could include "working side by side with [her team]."  (Krieger Decl. ¶ 22.)  The remainder of

23   _____

24   [11] At his deposition, Ramos testified that his work duties were based on how many Athletes were working
     during his shift -- "If we did not have enough Athletes, then we had to do the job ourselves."  (Ramos Dep.
25   222:21-22.)  Ramos also testified that he "can't answer" how much other AHCs were working.  (Ramos
     Dep. 220:25-221:5.)
26   [12] At her deposition, Flores testified that she also performed managerial duties "throughout her shift" and "I
     was responsible for ensuring the policy and procedure was followed."  (Flores Dep. 82:16-22.)  Flores also
27   testified that "I was responsible for ensuring that everybody, the team, was meeting that overall goal that the
     store was successful."  (Flores Dep. 132:24-133:2.)  Flores testified that, while on the sales floor, if you
28   "observed something" you would "give feedback."  (Flores Dep. 56:2-6.)  Flores was also responsible for
     interviewing job applicants and completing a scorecard that was used for the hiring decision -- "I sat on a
     panel and we interviewed 500, approximately 500 applicants."  (Flores Dep. 34:13-35:2.)

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1 the time, she spent performing duties such as "analyzing business results," "planning for peak times,"

2 "observ[ing] her team," or planning for the Nike's Women's Marathon.  (Krieger Decl. ¶¶ 11-15, 18-19.)

3   Plaintiff's declarant Alex Dakin currently works as an AHC in Folsom, California.  (Dakin Decl.

4 ¶2.)  Dakin testified that "Nike Assistant Head Coaches, like myself, spend a vast majority of our time

5 engaged in the performance of nonexempt tasks" and "sometimes I am required to spend a majority of my

6 day working on the sales floor performing the same exact duties that are routinely performed by nonexempt

7 Athletes" such as "folding, hanging, cleaning up, cashiering, shelving, racking, unboxing, re-boxing,

8 shuttling merchandise to and from the stockroom, greeting customers, and waiting on customers."  (Dakin

9 Decl. ¶ 7.)[13]  In contrast, Defendant's declarant Shanna Shurin, an AHC working in Beverly Hills, testified

10 that "I generally spent 80% of my shift overseeing the operations of the store" which included "creating

11 weekly and daily schedules, supervising the shipping and receiving team and the cash wrap team, running

12 morning huddles, handling payroll, and meeting sales goals."  (Shurin Decl. ¶¶ 7, 10.)

13   Plaintiff's declarant Glenn Whye worked as an AHC in San Ysidro and Cabazon, California.  (Whye

14 Decl. ¶ 2.)  He testified that he "spent about sixty (60) to sixty-five (65) percent of [his] time performing

15 identical tasks that nonexempt employees were expected to perform," such as "folding, hanging, cleaning up,

16 cashiering, shelving, racking, unboxing, re-boxing, greeting customers, and waiting on customers."  (Whye

17 Decl. ¶ 10.)[14]  In contrast, Defendant's declarant Jennifer Greer worked as an AHC in Gilroy, California.

18

---

[13] At his deposition, Dakin was less certain about how much time other AHCs other than himself spend on various tasks.  As he testified, "I mean, I'm not speaking for anyone else in any other position, but, you know, I can imagine that since **business varies in different locations**, that there could be other times that they are spending on or that they are not spending on the aligned tasks." (Dakin Dep. 139:1-6.)
At his deposition, Dakin also testified that he did more than just folding, hanging, and cleaning up -- he testified "I am in charge of [the] department." (Dakin Dep. 78:9-10, 12-13.)  Dakin also testified that he is "constantly" engaged in duties to develop the Athletes that work with him -- "I constantly make sure that I am doing everything that I can do develop the Athletes that work with me to help them in their roles."  (Dakin Dep. 34:23-35:4.)  This includes "engaging in coaching in the moment, when needed."  (Dakin Dep. 68:9-11.)  Dakin also testified that "I have been involved in the interview process and the screening of applicants that applied to our store" and "then we will make a, you know, mutual combined decision as a management team on who we decide to hire."  (Dakin Dep. 38:4-10.)  During the weeks when Dakin was interviewing job applicants, he spent more than 50 percent of his time performing interviewing responsibilities because "interviewing is definitely an all-day task."  (Dakin Dep. 144:8-18.) Dakin conceded that when interviewing "I do spend, you know, 50 percent of my day doing managerial duties." (Dakin Dep. 144:1-4.)
[14] At his deposition, Whye testified that he "was part of a management team in making decisions."  (Whye Dep., 18:15-20.)  Whye testified that "if [he] observed an associate not doing what he or she was supposed to be doing, as the Assistant Head Coach, [he] would counsel that associate."  (Whye Dep., 45:23-46:2.)  Whye testified that "Athletes had to be managed throughout the entire day."  (Whye Dep., 47:11-13.)  This meant that "100 percent of the time if you observe behavior that requires correction or coaching to an Athlete, you were responsible for doing it."  (Whye Dep., 48:9-16.)  Whye testified that "all the managers were

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1   (Greer Decl. ¶ 4.)  She testified that as an AHC, she "spent about 80% to 90% of my time performing

2   managerial, or exempt work" and that she "never spent more than 20% of my time on nonmanagerial, or

3   nonexempt tasks and duties." (Greer Decl. ¶ 16.)  She explained that the nonmanagerial work generally

4   "accounted for time spent assisting consumers here and there throughout the week" and that she "I rarely did

5   any manual labor, and instead leveraged the Athletes in my store to complete such tasks." (Greer Decl. ¶ 16.)

6          Plaintiff's declarant Breanna Cherry worked as an AHC in Cabazon and San Clemente,

7   California.  (Cherry Decl. ¶ 2.)  She testified that, "I was routinely required to perform manual labor

8   involved in setting up, moving, and breaking down displays, and constructing and moving new fixtures, and

9   reconfiguring and moving outdated fixtures, and I was also routinely required to perform the manual labor

10   involved in replacing dated merchandise with new merchandise." (Cherry Decl. ¶ 7.)[15]  In contrast,

11   Defendant's declarant Roberto Pocasangre works as an AHC in Santa Monica, California.  (Pocasangre

12   Decl. ¶ 3.)  He testified that as an AHC, he spends "at least 80% of [his] time performing managerial duties

13   related to the product and apparel business," (Pocasangre Decl. ¶ 15), and he "[does] not fold shirts, stock,

14   move product or service customers as part of my job as an Assistant Head Coach." (Pocasangre Decl. ¶

15   19.)  As he explained, "[s]uch work takes me away from doing my job, which is managing my department

16   and monitoring my Coaches and Leads." (Pocasangre Decl. ¶ 19.)  Pocasangre further testified that when he

17   hears "comments from [his] team that [he is] not helping them move product or boxes," he responds "by

18   reminding them that it is their job is to do that task, not [his]." (Pocasangre Decl. ¶ 19.)  Although Cherry

19   and Pocasangre provided very different testimony about the amount of time spent performing different job

20   duties, both of them were AHCs in charge of the Product (Footwear and Apparel) Department at Nike

21   stores.  (Cherry Dep. 60:5-8, 16-18; Pocasangre Decl. ¶ 12.)

22          Plaintiff's declarant Steven Wilson worked as an AHC in Folsom, California.  (Wilson Decl. ¶ 2.)  He

23

24   responsible for monitoring the team, either in the front of the house or the back of the house, depending on
    wherever they were assigned or depending on where you were working."  (Whye Dep., 50:18-21, 23-24.)
    [15] At her deposition, Cherry testified that she was also responsible to "provide feedback in how [junior

25   coaches] are performing their job duties" and she had to "hold them accountable for their daily tasks."
    (Cherry Dep. 137:14-18, 20.)  Cherry testified that she provided "in the moment coaching" to Athletes.

26   (Cherry Dep. 128:18-20.)  As an AHC, Cherry also would "make adjustments in scheduling to either send
    someone home early or call in additional employees."  (Cherry Dep. 147:4-7, 9.)  Cherry also reassigned

27   athletes to different areas of the store based on business needs and would "pull athletes from one area of the
    store to another area of the store because traffic was busier in an area and there wasn't adequate coverage."

28   (Cherry Dep. 147:17-21.)

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

testified that "I was routinely required to perform the same tasks performed by nonexempt employees, specifically, folding, hanging, cleaning up, shelving, racking, unboxing, re-boxing, shuttling merchandise to and from the stockroom, greeting customers, and waiting on customers." (Wilson Decl. ¶ 8.)[16]   In contrast, Defendant's declarant Jenna Etherington, who was an AHC at the Citadel store in Los Angeles, California (Etherington Decl. ¶ 4), testified that "on a weekly basis, I spent about 98% of my time performing managerial, or exempt work." (Etherington Decl. ¶ 20.)  She explained that "[m]y job responsibilities included managing the sales floor and the flow of product and all the employees in my department." (Etherington Decl. ¶ 11.)  Etherington explained that "[t]his included making sure plans were in place for prioritizing product deliveries and for moving product around the sales floor and from the stockroom to the sales floor, as well as forecasting product needs, communicating product needs, managing inventory, and ensuring timely execution of all directives, among other duties.  I also was responsible for product knowledge training, store appearance, and ensuring the department is making sales goals." (Etherington Decl. ¶ 11.)

Plaintiff's declarant Michael Cornwell worked as an AHC in Milpitas, California.  (Cornwell Decl. ¶ 2.)  He testified that "I was routinely required to perform manual labor involved in setting up and breaking down displays and constructing new fixtures and reconfiguring out dated fixtures, and I was also routinely required to perform manual labor involved in replacing dated merchandise with new merchandise." (Cornwell Decl. ¶ 10.)  Cornwell also testified that he "was routinely required" to perform tasks such as "folding, hanging, cleaning up, cashiering, shelving, racking, unboxing, re-boxing, shuttling merchandise to and from the stockroom, greeting customers, and waiting on customers." (Cornwell Decl. ¶ 10.)[17]  In

---

[16] At his deposition, Wilson testified that for three months he was "the highest level leader in the store." (Wilson Dep. 28:8-10.)  Even when Wilson was not the highest level leader in the store, he would "give daily direction to the team . . . when needed" and he would determine when direction was needed based off of the business.  (Wilson Dep. 102:19-22, 102:25-103:8.)  Wilson also testified that "[he] needed to understand as the leader when it was right to provide the direction."  (Wilson Dep. 103:9-11, 13.)

[17] At his deposition, Cornwell testified that his job required him to "coach and train athletes." (Cornwell Dep. 45:11-13.)  Cornwell also testified that "as part of the management team, [he was] interviewing, hiring, onboarding, and responsible for performance management."  (Cornwell Dep. 60:20-22, 61:1-2.)  Cornwell also was responsible for "checking up with people to make sure they're taking their breaks down on the sales floor, making sure the customers are being helped, reassigning people and positions." (Cornwell Dep. 68:21-69:7.)  Cornwell also counseled athletes and provided "coaching in the moment." (Cornwell Dep. 69:11-14.)  Cornwell explained that "on any given day I would say that we would spend most of our time being the manager on duty that -- being responsible for actually how the -- full flow of the sales floor was going." (Cornwell Dep. 97:2-5.)  Throughout the day, Cornwell testified that "we would be giving out regular updates over our little headsets about what our sales goal for the hour was, what -- where we're tracking to and what we need to call out.  And then we would be walking the sales floor constantly, saying, 'Okay. These are the areas that need to get refilled.'" (Cornwell Dep. 97:6-11.)

17

contrast, Defendant's declarant Blythe Bejan, who was an AHC in Santa Monica, California (Bejan Decl. ¶ 3), testified that "I always spent over 50 percent of my shift performing managerial duties."  (Bejan Decl. ¶ 7.)  She explained that "this included overseeing the operational procedures in the stockrooms, supervising the operations team, managing payroll, preparing for and supervising loss prevention audits, and running special projects."  (Bejan Decl. ¶ 7.)  Bejan testified that "I monitored and directed my operations team to ensure the merchandise was efficiently and accurately stocked and organized in the stockrooms."  (Bejan Decl. ¶ 8.)  Bejan was also responsible for security and regulatory issues -- "I made sure the store was in compliance with various regulatory procedures and paperwork, such as keeping track of the funds in the safe, following the rule of two when handling cash, and taking tills at the end of the night."  (Bejan Decl. ¶ 9.)  Bejan explained that "the loss prevention score was a direct reflection of how efficiently the store was running under my supervision." (Bejan Decl. ¶ 9.)

In sum, Plaintiff and her seven declarants testified to performing both exempt and nonexempt job duties.  Defendant's 15 declarants also testified to performing both exempt and nonexempt job duties.  (SS ¶¶ 34-36, 65-83, 90.)  Assuming that all of Plaintiff's witnesses would provide credible testimony at trial showing that they were primarily engaged in nonexempt duties, and all of Defendant's witnesses would provide credible testimony at trial showing that they were primarily engaged in nonexempt duties, it would be necessary to have 23 separate mini-trials for each individual AHC.[18]

Plaintiff has offered nothing to show how the testimony of any witness can be extrapolated to any other witnesses based on any discernable factors such as store location, store type, store manager, departmental assignment, years of employment, or whether the witness is a current or former employee.  There is simply no way to identify which potential class members qualify as exempt employees without direct and cross examination of each of them regarding their daily, weekly, monthly, or yearly job duties.[19]

---

[18] Plaintiff has provided seven declarations from AHCs who testified that the majority or significant portion of their time is spent performing nonmanagerial tasks.  Defendant has provided 15 declarations -- more than twice as many as Plaintiff -- from AHCs who testified that the majority of their time was spent performing managerial responsibilities. (SS ¶¶ 91, 92, 94,95.)
[19] Of course, the separate mini-trials would not be limited to merely the AHCs as witnesses.  Given the credibly issues with Plaintiff's declarants, as shown above, it would also be necessary to offer testimony from their Head Coaches, District Store Directors, and coworkers who personally observed them performing their job responsibilities.  (*See, e.g.*, Gamez Decl. ¶¶ 4-12.)

18

1

2

### b. Evidence of AHCs Performing The Same Work As Subordinates Does Not Affect Whether They Were Primarily Engaged In Performing Exempt Duties.

Plaintiff's only "common proof" that AHCs are not primarily engaged in performing exempt duties is based on her argument that some of the work performed by AHCs "consisted of work of the same nature as that performed by [their] nonexempt subordinates." (Dkt. 41, Motion, 24:11-20.) Plaintiff then concludes that any work that was also done by nonexempt employees cannot be counted as exempt work for purposes of being primarily engaged in exempt responsibilities. (*Id.*)

Plaintiff's argument is incorrect because the exemption is based on the nature of the **work** itself, not the identity of the **worker**. As the court held in *Heyen v. Safeway Inc.*, 216 Cal. App. 4th 795, 819 (2013), a case cited by Plaintiff (Dkt. 41, Motion, 24:14-15), "the activities constituting 'exempt' and 'nonexempt' work 'shall be construed in the same manner as' such activities are construed pursuant to the Federal Fair Labors Standards Act in enumerated section of the code of Federal Regulations, including those versions of Title 29, section 541.102." *Id.* As stated in 29 C.F.R. section 541.102(b), exempt duties include "[i]nterviewing, selecting, and training of employees;" "directing their work;" "appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status;" "disciplining them when necessary;" "planning the work;" "apportioning the work among the workers;" and "controlling the flow and distribution of materials or merchandise and supplies." *Heyen*, 216 Cal. App. 4th at 819.

Further, 29 C.F.R. section 541.108(a) provides that "exempt work includes not only the tasks necessary for the actual management of the department and supervision of its employees, but also tasks that are 'closely associated with the performance of the duties involved in such managerial and supervisory functions of responsibilities.'" *Heyen*, 216 Cal. App. 4th at 819. Such tasks may be performed by supervisors "because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible." *Id.* at 819. The fact that nonexempt employees may also perform the same work does not transform the work into a nonexempt duty -- "Frequently such exempt work is of a kind which in establishments that are organized differently or which are larger and have greater specialization of function, may be performed by a nonexempt employee hired especially for that purpose." *Id.* at 819-20.

### 2. Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate As To The Failure Of The AHCs To Exercise "Discretion and Independent Judgment".

Plaintiff argues that Defendant is a "standardize hierarchical chain" and that AHC are "uniformly

19

subordinate to the Head Coach of the retail stores." (Dkt. 41, Motion, 10:10-18.)  Plaintiff further argues that each AHC uniformly lacks the ability to make decisions because "decisions are guided by policies, procedures, and business plans" and each AHC "receives guidance and oversight from [their] manager." (Dkt. 41, Motion, 11:10-11.)  Thus, Plaintiff concludes that class certification is warranted because AHCs are commonly subject to "management oversight and are constrained by policies." (Dkt. 41, Motion, 11:14.)

Yet, this Court has already found that "Patel concedes that she satisfies most of the requirements necessary to qualify for the executive exemption" and that "Nike has demonstrated that Patel's work as an assistant head coach met the requirements of subsections (b) through (d) of the executive exemption as a matter of law."  (Dkt. 36, MSJ Order, 1:21-22, 5:5-7.)  Subsection (d) of the executive exemption requires that an exempt employee is someone "who customarily and regularly exercising discretion and independent judgment."  8 Cal. Code Regs. Title 11070(1)(A)(1)(d).  Given that the Court has already held that Plaintiff herself **did** "customarily and regularly exercised discretion and independent judgment," common issues cannot predominate as to whether the proposed class of AHCs **did not** "customarily and regularly exercise discretion and independent judgment."[20]

However, even if Plaintiff could revive her argument that AHCs did not exercise independent judgment and discretion, she still cannot show that common issues predominate because the degree and frequency of independent judgment and discretion varied widely among the AHCs.  Some AHCs testified that they consistently exercised independent judgment and discretion on significant issues, while other AHCs testified that they never made any decisions about anything.  (*See* SS ¶¶ 34-36, 41-64, 98-114.)

For example, Jenna Etherington, a former AHC in Santa Monica, testified that she frequently made

---

[20] In any event, Plaintiff's argument is based on the flawed premise that any employees who are part of a supervisory hierarchy are subject to class certification.  Under this logic, every class would be certified because every employee -- no matter how high ranking -- is subject to some degree of supervision by a superior.  For purposes of class certification, "it is the degree of supervision that is key, and the degree of supervision of class members cannot be determined on common proof because they evidence indicates that they had significantly different experiences while working for Defendants."  *Mekhitarian v. Deloitte & Touche (ICS), LLC*, 2009 WL 6057248 at *4 (C.D. Cal. 2009).  *Accord Akaosugi.*, 2012 WL 3999855 at *5 (N.D. Cal., Sept. 7, 2012) ("Courts have recognized that modern companies often implement policies aimed at standardizing procedures and services, but the exercise of discretion 'even when circumscribed by prior instruction' is still required and critical to the success of the enterprise;" "although plaintiffs may not have influenced or created certain policies, such as labor budgets, this does not refute that they regularly exercised discretion and independent judgment"); *Taylor v. United Parcel Serv.*, 190 Cal. App. 4th 1001, 1026 (2010) (acknowledging the reality that the "modern workplace is a regulated workplace [], often overlayed by internal policies and procedures," but that "merely because an employer requires adherence to regulations, guidelines or procedures does not mean an executive does not exercise discretion or judgment")

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

decisions about how to display and merchandise different product in different parts of the store -- "I made the decision to move the performance wear to the right side of the store where consumers came off the escalator to increase visibility of the product.  I then analyzed the data after this move to see if it had an impact on sales.  In another instance, I decided to pull an entire category off the floor because it had the lowest sales margin."  (Etherington Decl. ¶ 15.)  Etherington stressed that "my Head Coach told me I could do whatever I thought was needed to increase sales."  (Etherington Decl. ¶ 15.)  In contrast, Steven Wilson, a former AHC in Milpitas, testified that he could not exercise any discretion about sales, displays, or merchandising -- "I was not permitted by Nike to exercise discretion or independent authority with regard to set-up, display, selection of merchandise, or appearance of [my] department."  (Wilson Decl. ¶ 6; *see also* SS ¶¶ 98-105.)

Plaintiff's declarant Breana Cherry, an AHC in San Clemente, and previously in Cabazon, testified that she has to prioritize her work throughout the day based on business needs -- "depending on what may be going on that day, whether there is multiple call outs and they need to have more coverage or -- yeah, depending on if there is a certain executable that needs to be done, whether it is planning initiative, I would, yeah, have to prioritize my -- my work and make sure that it coincides with when I would have a CEL or Team Captain shift."  (Cherry Dep. 183:13-14, 17-23.)  Cherry testified that as a Team Captain she could make decisions "to make sure there was adequate coverage on the sales floor" and make decisions "to pull coverage if you were light in a particular area to fill in to accomplish tasks during the day."  (Cherry Dep. 85:23-86:5, 8.)  Brian Aquino, an AHC in Petaluma, testified that he has to make decisions through his shift -- "Throughout my shifts, I decide what I am going to be doing at any given moment in time.  I also decide how to direct what any individual Coach, Lead or Athlete is doing at any given moment.  I have to make decisions regarding staffing, resolving consumer issues, approving overtime and how schedule the work through the day, among other decisions."  (Aquino Decl. ¶ 19; *see also* SS ¶¶ 106-114.)

In contrast, Glenn Whye, a former AHC in San Ysidro and Cabazon, testified that he was nothing more than a diddle-dawdle drone who never had to think about anything in order to do his job -- "Nike was one of the few companies that I worked with where I could just show up to work and put no thought to it. Like, I already knew what was going to be given to me because it was already dictated and handed down." (Whye Dep. 28:1-5.)

As the evidence in the record shows, Defendant did not have standardized policies that regulated the degree of decision making available to AHCs, given the wide range of discretion and independent judgment exercised by the declarants.  To be sure, the amount of discretion and independent judgment would require an individualized analysis based on factual differences that cannot be extrapolated across the proposed class.[21]

### 3.   Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate To Show That The AHCs Were Not "Managing A Customarily Recognized Department Or Subdivision".

Plaintiff argues the AHCs cannot "qualify for the Executive Exemption because 'each one was a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool.'" (Dkt. 41, Motion, 23:21-24.)  In support of this, Plaintiff argues that AHCs did not spend all of their time managing a customarily recognized department or subdivision because they were occasionally performed store-wide responsibilities -- rather than responsibilities to manage a specific department -- when they served in the role of "Customer Experience Leader" ("CEL") or "Manager on Duty" ("MOD").  Also, while working as a CEL or MOD, Plaintiff argues that AHCs were "commonly engaged in nonexempt work such as assisting customers and completing sales."  (Dkt. 41, Motion, 24:6-10.)

### a.   Individualized Issues Predominate To Determine the Degree That Each AHC Continued To Manage Their Department Even While Acting As The CEL Or MOD.

Although Plaintiff argues that AHCs were not engaged in "the management of a customarily recognized department or subdivision," as required under the Executive Exemption, the evidence in the record shows that some AHCs continued to be responsible for the management of their department while assigned to an MOD or CEL role.  (SS ¶ 116.)  As Defendant's corporate witness explained, "even when the CEL is responsible for the entire floor, they would still be responsible for their department" and "even when the individual is not physically located in his department because he is performing MOD duties, he is still responsible for his department."  (Dorsey Dep. 121:20-122:11, 14-25.)  Jenna Etherington, a former AHC in Citadel, testified that "[a]t all times when I was performing CEL duties, I still was responsible for managing my department and completing all my department work."  (Etherington Decl. ¶ 16.)  Aaron Ernest, an AHC in Tejon Ranch, provided the same testimony.  (Ernst Decl. ¶ 14.)  Glenn Whye, a former AHC in

---

[21] As explained by Jennifer Greer, a former AHC in Gilroy, the degree of discretion and independent judgment can be based on relationship between an AHC and their Head Coach -- "In my experience, the amount of decision-making power and independent judgment that an Assistant Head Coach has is very much dependent on the management style of the Head Coach."  (Greer Decl. ¶ 30.)

1   San Ysidro and Cabazon, testified that an AHC could be responsible for managing their department while,

2   at the same time, be responsible for acting as the MOD -- "somebody could be assigned as an Assistant

3   Head Coach in the apparel department, and then for part of the day also be assigned as a manager on duty"

4   and they "could absolutely have two to three duties in a day at the same time." (Whye Dep. 44:9-14.)

5       **b.   Individualized Issues Predominate Regarding The Amount Of Time Each AHC Spent
         As CEL Or MOD Which Varies Based On Peak Hours, Size Of The Management
6        Team, And Number of Floors.**

7           Even if the work performed while serving as a CEL or MOD constituted nonexempt tasks such as

8   assisting customers and stocking products, individualized inquiry is still necessary to determine the amount

9   of time spent performing these duties. As this Court already found, the time spent "on more general store

10  activities, such as CEL and MOD roles, raised genuine issues of material fact regarding whether Plaintiff's

11  primary duty was the management of a recognized unit." (Dkt. 36, MSJ Order, 9:16-10:6.)

12          Here, the evidence in the record shows that the amount of time they spend as a CEL or MOD varies

13  from day to day and from store to store. As Defendant's corporate representative testified, there are no

14  policies stating the "minimum amount of time" or "maximum amount of time" that an employee should spend

15  in either the CEL or MOD role. (Dorsey Dep. 206:6-14.) Plaintiff herself testified that "there were certain

16  days where we may be CEL or MOD for a good six hours back and forth between everything, or some days it

17  could be that we were scheduled it for two hours or three hours. So it . . . varied." (Patel Dep. 125:10-17.)

18          Ryan Foss, a former AHC in Vacaville, explained that "we only performed MOD duties, in addition

19  to the CEL duties, during peak hours." (Foss Decl. ¶ 21.) Michael Cornwell, a former AHC in Milpitas,

20  testified that the amount of time spent as an MOD "depended on how many people were actually in the

21  building at the time and what the overlap looked like." (Cornwell Dep. 98:6-9.) Cornwell admitted that

22  there were "possibly . . . some days where you were assigned to be an MOD for one hour only." (Cornwell

23  Dep. 98:13-18.) Steven Wilson, a former AHC in Folsom, testified that he worked two hours as a CEL "in

24  any given day or shift." (Wilson Dep. 49:9-11.) Several declarants testified that they spent only one or two

25  hours per shift as an MOD or CEL. (Greer Decl. ¶ 10; Bejan Decl. ¶ 14; Porto Decl. ¶ 16; Pocasangre Decl.

26  ¶ 15; Etherington ¶ 14.) One AHC never performed CEL duties -- "[T]he Assistant Head Coach of the

27  Service Center did not perform the duties of a [CEL]." (Gamez Decl. ¶ 18.)

28          Even if all AHCs performed some MOD or CEL duties, the evidence in the record shows wide

variations as to whether they were still responsible for a specific department within their stores, as well as wide variations as to the amount of time spent as an MOD or CEL in order to determine whether their "primary duty was the management of a recognized unit."  (Dkt. 36, MSJ Order, 10:6; *see* SS ¶¶, 117-126.)

### 4.  Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate As To Classwide Damages

Even if Plaintiff could meet her burden to show that common issues predominate as to liability, this case still cannot satisfy the requirement of Rule 23(b)(3), because class certification is inappropriate where "[q]uestions of individual **damage calculations** will inevitably overwhelm questions common to the class." *Comcast*, 133 S.Ct. at 1433 (emphasis added).[22]  Here, class certification is inappropriate because Plaintiff cannot demonstrate that there is a class-wide method for awarding damages for unpaid wages, overtime pay or meal and rest period premium pay.[23]  Indeed, the evidence in the record shows that the number of hours each AHC worked requires an individualized inquiry directed at each AHC and would be based on their memory.  (Patel Dep. 227:9-12; Ramos Dep. 220:25-221:2, 5-8, 11; SS ¶ 127-141.)

### 5.  Plaintiff Cannot Meet Her Burden To Establish That Common Issues Predominate For A Sub-Class Of AHCs Who Participate In Various Training Programs

Plaintiff argues for certification of a subclass of AHCs "for the time period during which they were classified as exempt and in the training phase of their employment."  (Dkt. 41, Motion, 5:13-16.)  Plaintiff argues that "class members were classified as exempt during their four (4) week orientation when they were training to become an 'executive.'"  (Dkt. 41, Motion, 5:19-21.)  Plaintiff, therefore, concludes that AHCs could not be performing executive work while also participating in training programs.

Although Plaintiff argues that the "training phase" for AHCs spanned four weeks, she offers no evidence to show how or when the training took place -- e.g. whether the training was provided through an off-site seminar, or daily classes, or on-the-job exercises, or simply an assignment to review written course work.  Plaintiff also does not provide any evidence as to whether the AHCs were performing other job

---

[22] *See Astiana v. Ben & Jerry's Homemade, Inc.*, 2014 WL 60097, at *12 (N.D. Cal. Jan. 7, 2014) ("[U]nder *Comcast*, a court can certify a Rule 23(b)(3) class only if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with the plaintiffs' theory of liability.")
[23] Plaintiff offers only one methodology for calculating the amount of time worked by AHCs -- she argues that comparing the time stamp of the "daily recap" emails sent with an AHC's schedule for the day provides the amount of hours worked.  (Dkt. 41, Motion, 25:14-16.)  However, "daily recap" emails were only sent by AHCs on closing shifts and did not have to be sent for morning shifts or mid-day shifts.  (Ramos Dep. 184:20-186:14.)  Even when daily recap emails were sent for closing shifts, this activity was not necessarily the last thing done by an AHC before leaving the store.  (Cornwell Dep. 63:8-23.)

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS

1  duties during their training -- e.g. whether the training included assignments to manage a specific
2  department or subdivision, supervise other employees, or exercise discretion and independent judgment.

3  As Defendant's corporate representative explained, the training "would vary on a store-by-store
4  basis" and "you'd have to determine individually if a head coach decided more time was needed or any
5  supplemental resources might be used." (Dorsey Dep. 60:25-61:5.)  Defendant's corporate representative
6  further explained that the training "could happen solely in the store where the employee's going to be
7  working or there have been instances where I have leveraged other stores to assist and have had the new
8  assistant or coach travel to a new store to work with a peer to get a better understanding of what their role
9  on a day-to-day basis entails." (Dorsey Dep. 64:18-65:4.)

10  Some AHCs did not receive any formal onboarding training at all, but received only ad hoc on-the-
11  job training.  Dennis Porto, a former AHC in Camarillo, testified that "I learned how to perform the job
12  duties of an AHC mostly through informal on-the-job training and by observing and talking with the other
13  AHCs."  (Porto Decl. ¶ 5.)  Briana Cruz, a former AHC in San Francisco, testified that "I learned how to
14  perform my job duties by observing and shadowing the other AHCs.  I also had been working at the San
15  Francisco store for a few years and I knew from my experience at Nike about the job duties and
16  expectations of an AHC."  (Cruz Decl. ¶ 4.)  Roberto Pocasangre, an AHC in Santa Monica, testified that "I
17  was very eager to start working in my new role and thought I would learn most by being on the floor.  As a
18  result, my training was a combination of on-the-job training and shadowing my Head Coach."  (Pocasangre
19  Decl. ¶ 11; *see also* SS ¶ 142-145.)

20  Given that there is no common evidence as to the "who," "what," "when," "where," and "why" of
21  the training, individualized issues predominate and Plaintiff cannot meet her burden to certify a sub-class.

22  **IV.    CONCLUSION**

23  For all the reasons stated above, class certification should be denied, both as to the entire class and
24  the proposed sub-class.

25  DATED: December 1, 2015                        SEYFARTH SHAW LLP

26                                                 By: */s/ Jon D. Meer*
27                                                     Jon D. Meer
                                                       Maya Harel
                                                   Attorneys for Defendant
28                                                 NIKE RETAIL SERVICES, INC.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION;
CASE NO. 3:14-CV-04781-RS